Norman E. KREHL, et al.,
Plaintiffs-Appellants,

v.

BASKIN–ROBBINS ICE CREAM COM-PANY, et al., Defendants-Appellees.

No. 80–5068.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 8, 1981.

Decided Jan. 4, 1982.

Rehearing and Rehearing En Banc
Denied Feb. 24, 1982.

---

Dean Richard Calkins, Burditt & Calkins, Chicago, Ill., for plaintiffs-appellants.

Stuart L. Kadison, Los Angeles, Cal., argued for defendants-appellees; Kadison, Pfaelzer, Woodard, Quinn & Rossi, Ernest A. Braun, Bartman, Braun & Halper, Robert E. Willard, Holley, Galen & Willard, Los Angeles, Cal., on brief.

Before ELY and REINHARDT, Circuit Judges, and CORDOVA,[*] District Judge.

ELY, Circuit Judge:

In this class action antitrust suit against Baskin-Robbins Ice Cream Company [BRICO] and its area franchisors,[1] certain franchisees[2] appeal from an order of involuntary dismissal entered against them by the District Court. Because franchisees stipulated that Baskin-Robbins would be entitled to judgment absent proof of a *per se* violation of the antitrust laws, we have no occasion to consider the lawfulness of the challenged business practices under the so-called "rule of reason." We affirm.

## I. FACTUAL BACKGROUND

BRICO, the nation's largest chain of ice cream specialty stores, operates the quintessential franchise system. *See generally* ABA Antitrust Section, Monograph 2, Vertical Restrictions Limiting Intrabrand Competition, 1–6 (1977). Originally a small Southern California ice cream manufacturer, BRICO[3] initially engaged in the direct franchising of retail outlets in California. In 1959, BRICO began a program of expansion through licensing independent manufacturers to produce Baskin-Robbins ice cream and establish Baskin-Robbins franchised stores. This mode of expansion was chosen because shortages of capital and personnel rendered any other method impracticable.

The distribution system employed by BRICO has essentially three tiers. At the top is BRICO itself. It manages the chain of franchised stores, selects the area franchisors, and, through a wholly owned sub-

sidiary,[4] acts as the prime lessor of all Baskin-Robbins store properties.

At the second level of the system are the eight independent manufacturers licensed by BRICO to operate as area franchisors. BRICO, again through a wholly owned subsidiary, also operates at this level, acting as an area franchisor in six exclusive territories. The independent area franchisors are contractually bound to BRICO by Area Franchise Agreements. These agreements provide each area franchisor with an exclusive territory in which to manufacture Baskin-Robbins ice cream products. They also authorize the area franchisors, in conjunction with BRICO, to establish and service Baskin-Robbins franchised stores within their respective territories. Under these agreements, the area franchisors are forbidden to disclose the secret formulae and processes by which Baskin-Robbins ice cream products are manufactured.

The third level of the Baskin-Robbins system is composed of the franchised store owners. These independent businessmen are bound to both BRICO and the area franchisor by the standard form Store Franchise Agreement. Under these agreements, the franchised store may sell only Baskin-Robbins ice cream products purchased from the area franchisor in whose territory the store is located.

It is important to note that BRICO utilizes a "dual distribution" system. Under this system, BRICO operates on two distinct levels of the distributional chain. As the owner of the Baskin-Robbins trademarks and formulae, it licenses independent area franchisors to manufacture Baskin-Robbins

---

[*] Honorable Valdemar A. Cordova, United States District Judge, District of Arizona, sitting by designation.

1. For the sake of convenience, Baskin-Robbins Ice Cream Company and its area franchisors will be collectively referred to as "Baskin-Robbins." When necessary to differentiate between them, the area franchisors will be referred to as such and Baskin-Robbins Ice Cream Company will be referred to as "BRICO."

2. Of the 2687 potential class members, 1768 requested exclusion under Fed.R.Civ.P. 23(c)(2).

3. BRICO was originally known as the Huntington Ice Cream Company.

4. BRICO operates through several wholly owned subsidiaries and, in addition, has undergone several corporate reorganizations in the recent past. Because the parties stipulated that BRICO be treated as a single enterprise for purposes of this lawsuit, we do not consider the effects, if any, of these reorganizations.

ice cream and establish franchised stores. In this respect, BRICO's relationship to the area franchisors is vertical in nature. BRICO also operates as an area franchisor, thereby assuming a horizontal position relative to the other area franchisors.

BRICO provides extensive advertising and promotional support for both the area franchisors and the store franchisees. As part of its services to the area franchisors, BRICO sponsors quarterly Marketing, Organization, and Planning [MOAP] meetings. Attendance of these meetings is voluntary but, generally, a majority of the area franchisors are represented. At these meetings, topics of current interest are discussed, including marketing strategy, industry trends and costs. On occasion, informal discussions regarding wholesale and retail prices have taken place.

Certain franchisees of Baskin-Robbins bring this treble damage antitrust suit, alleging three separate *per se* violations of § 1 of the Sherman Act (15 U.S.C. § 1). First, they contend that Baskin-Robbins ice cream products are unlawfully tied to the sale of the Baskin-Robbins trademark. Second, they challenge the Baskin-Robbins "dual distribution" system as an unlawful horizontal market allocation. Finally, franchisees allege that BRICO and its area franchisors conspired to fix the wholesale prices of Baskin-Robbins ice cream products.

At the close of franchisees' case in chief, Baskin-Robbins moved to dismiss the action, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. The District Court, sitting without a jury, granted the motion, holding, *inter alia*, that: 1) The tie-in claim failed because franchisees did not establish that the Baskin-Robbins trademark was a separate product from Baskin-Robbins ice cream; 2) the horizontal market allocation

claim failed because franchisees did not establish the requisite concerted activity among competitors; and 3) the wholesale price fixing claim failed for lack of proof of a purpose or effect to fix prices.[5] This appeal, premised on 28 U.S.C. § 1291, ensued.

## II. ANALYSIS

### A. *Standard of Review*

Our first step in resolving the important issues presented by this appeal is a determination of the applicable standard of review. Rule 52(a) of the Federal Rules of Civil Procedure provides that the findings of fact made by the District Court, sitting without a jury, are not to be disturbed on appeal unless "clearly erroneous."[6]

Franchisees argue, however, that where the case rests primarily upon documentary evidence rather than live testimony, a more exacting inquiry by the appellate court is warranted. Because this case is based in large part on documentary evidence, franchisees contend the appropriate standard is one of *de novo* review.

In support of this contention, franchisees cite *James Burrough, Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266 (7th Cir. 1976). In that case, the Seventh Circuit held, that where the issue is likelihood of confusion in a trademark infringement case, the appellate court "is as capable as . . . the district court of determining" the ultimate legal issue based on an undisputed factual record and, therefore, *de novo* review is proper. *Id.* at 273. While we employ a similar rule in trademark infringement cases, *see J. B. Williams Co. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 190–91 (9th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976), we have repeatedly made clear that the propriety of

---

5. The District Court also found that franchisees had failed to establish fact of damage, a prerequisite for recovery under § 1 of the Sherman Act. Because of our resolution of the other issues on appeal, we do not reach this issue.

6. In *United States v. United States Gypsum Co.*, 333 U.S. 364, 394–95, 68 S.Ct. 525, 541, 92

L.Ed. 746, the Supreme Court defined "clearly erroneous": "[A] finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

de novo review "depends on the circumstances of each particular case." *Id.* at 190. The ultimate criterion is whether the controlling facts are in dispute. *Id.* If the material facts are in dispute, the "clearly erroneous" standard applies even to findings based entirely on written or documentary evidence. *See United States v. Mountain States Construction Co.*, 588 F.2d 259, 264 & n.5 (9th Cir. 1978); *Lundgren v. Freeman*, 307 F.2d 104, 113–15 (9th Cir. 1962). Here, the facts were hotly disputed by the parties at trial and competing inferences were forcefully pressed upon the District Court.[7] Under these circumstances, we conclude that the "clearly erroneous" standard governs the findings of the District Court in this case.

### B. *The Tie-in Claim*

It is well settled that there can be no unlawful tying arrangement absent proof that there are, in fact, two separate products, the sale of one (*i.e.*, the tying product) being conditioned upon the purchase of the other (*i. e.*, the tied product).[8] *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 613–14, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953); *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 47 (9th Cir. 1971). Franchisees argue that Baskin-Robbins' policy of conditioning the grant of a franchise upon the purchase of ice cream exclusively from Baskin-Robbins constitutes an unlawful tying arrangement. According to franchisees, the tying product is the Baskin-Robbins trademark and the tied product is the ice cream they are compelled to purchase.[9]

The critical issue here is whether the Baskin-Robbins trademark may be properly treated as an item separate from the ice cream it purportedly represents. We conclude, as did the District Court, that it may not.

In support of their tie-in claim, franchisees rely heavily on *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971). They contend that *Chicken Delight* established, as a matter of law, that a trademark is invariably a separate item whenever the product it represents is distributed through a franchise system. A careful reading of *Chicken Delight*, however, precludes such an interpretation and discloses that it stands only for the unremarkable proposition that, under certain circumstances, a trademark may be sufficiently unrelated to the alleged tied product to warrant treatment as a separate item.

In *Chicken Delight*, we were confronted with a situation where the franchisor conditioned the grant of a franchise on the purchase of a catalogue of miscellaneous items used in the franchised business. These products were neither manufactured by the franchisor nor were they of a special design uniquely suited to the franchised business. Rather, they were commonplace paper products and packaging goods, readily available in the competitive market place. In evaluating this arrangement, we stated that, "in determining whether the [trademark] . . . and the remaining . . . items . . . are to be regarded as distinct items . . . consideration must be given to the function of trademarks." *Chicken Delight*, 448 F.2d

---

**7.** In addition, approximately five days of trial were devoted to hearing live testimony.

**8.** Three additional elements must be proved to establish an unlawful tying arrangement: 1) some modicum of coercion, *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1216 (9th Cir. 1977); 2) economic power in the tying product, *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); and 3) a "not insubstantial" amount of commerce must be affected, *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Because we conclude that the Baskin-Robbins trade-

mark is not a separate product from Baskin-Robbins ice cream, we do not consider whether these elements are present here.

**9.** In their initial complaint, franchisees also alleged that certain other items (*i. e.*, store leases, equipments, supplies, and advertising) were unlawfully tied to the sale of the Baskin-Robbins trademark. These claims, however, were not certified for class treatment, *Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108 (C.D.Cal. 1978), and are therefore not properly before us. Accordingly, we express no opinion regarding the merits of these claims.

at 48. Because the function of the trademark in *Chicken Delight* was merely to identify a distinctive business format, we found the nexus between the trademark and the tied products to be sufficiently remote to warrant treating them as separate products.[10]  *Id.* at 48–49.

A determination of whether a trademark may appropriately be regarded as a separate product requires an inquiry into the relationship between the trademark and the products allegedly tied to its sale. *See id.* at 48. In evaluating this relationship, consideration must be given to the type of franchising system involved. In *Chicken Delight*, we distinguished between two kinds of franchising systems: 1) the business format system; and 2) the distribution system. *See id.* at 49.[11]  A business format franchise system is usually created merely to conduct business under a common trade name. The franchise outlet itself is generally responsible for the production and preparation of the system's end product. The franchisor merely provides the trademark and, in some cases, supplies used in operating the franchised outlet and producing the system's products. Under such a system, there is generally only a remote connection between the trademark and the products the franchisees are compelled to purchase. This is true because consumers have no reason to associate with the trademark, those component goods used either in the operation of the franchised store or in the manufacture of the end product. "Un-

der such a type of franchise, the trade-mark simply reflects the goodwill and quality standards of the enterprise it identifies. As long as … franchisees [live] up to those quality standards … neither the protection afforded the trade-mark by law nor the value of the trade-mark … depends upon the source of the components." *Id.* at 48–49.

Where, as in *Chicken Delight*, the tied products are commonplace articles, the franchisor can easily maintain its quality standards through other means less intrusive upon competition.[12]  Accordingly, the coerced purchase of these items amounts to little more than an effort to impede competition on the merits in the market for the tied products.[13]  *See Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Where a distribution type system, such as that employed by Baskin-Robbins, is involved, significantly different considerations are presented. *See* McCarthy, *Trademark Franchising and Antitrust: The Trouble with Tie-ins*, 58 Cal.L.Rev. 1085, 1108 (1970). Under the distribution type system, the franchised outlets serve merely as conduits through which the trademarked goods of the franchisor flow to the ultimate consumer. These goods are generally manufactured by the franchisor or, as in the present case, by its licensees according to detailed specifications.[14]  In this context,

---

**10.** We express no opinion whether, in the proper case, a trademark may be so closely linked to a component of the business format, to preclude a finding that the trademark is a separate product. *See Principle v. McDonald's Corp.*, 631 F.2d 303 (4th Cir. 1980).

**11.** Of course, a franchise system may be of the "distribution" type in relation to the end product of the system and of the "format" type in relation to the kinds of incidental supplies tied to the sale of the trademark in *Chicken Delight*. The crucial inquiry is into the relationship between the trademark and the product allegedly tied to its sale.

**12.** Provision of specifications for the manufacture of these products is one means often available to insure that franchisees maintain quality standards. *See Chicken Delight*, 448 F.2d at 51. Where, as here, the alleged tied product is

manufactured pursuant to secret formulae, the specification alternative is not available. *See id.* at n.9.

**13.** In some cases, however, this coerced purchase may be justified as necessary to prevent the sale of inferior goods under the franchisor's trademark. *See Chicken Delight*, 448 F.2d at 51; Note, *Quality Control and the Antitrust Laws in Trade-Mark Licensing*, 72 Yale L.J. 1171 (1963).

**14.** Franchisees argue that, because some Baskin-Robbins ice cream is manufactured by licensees instead of BRICO, the trademark must be a separate product. We reject this contention. Regardless of whether the ice cream is manufactured by BRICO or its licensees, the trademark still serves only to identify that distinctive ice cream made in accordance with

the trademark serves a different function. Instead of identifying a business format, the trademark in a distribution franchise system serves merely as a representation of the end product marketed by the system. "It is to the system and the *end product* that the public looks with the confidence that the established goodwill has created." *Chicken Delight*, 448 F.2d at 49 (emphasis added). Consequently, sale of substandard products under the mark would dissipate this goodwill and reduce the value of the trademark. The desirability of the trademark is therefore utterly dependent upon the perceived quality of the product it represents. Because the prohibition of tying arrangements is designed to strike solely at the use of a dominant *desired* product to compel the purchase of a second *undesired* commodity, *id.* at 47, the tie-in doctrine can have no application where the trademark serves only to identify the alleged tied product.[15] The desirability of the trademark and the quality of the product it represents are so inextricably interrelated in the mind of the consumer as to preclude any finding that the trademark is a separate item for tie-in purposes.

In the case at bar, the District Court found that the Baskin-Robbins trademark merely served to identify the ice cream products distributed by the franchise system. Based on our review of the record, we cannot say that this finding is clearly erroneous. Accordingly, we conclude that the District Court did not err in ruling that the Baskin-Robbins trademark lacked sufficient independent existence apart from the ice cream products allegedly tied to its sale, to justify a finding of an unlawful tying arrangement.

secret formulae and processes developed by BRICO.

15. In this situation, it is simply impossible for the trademark to be desirable if the product it represents is perceived as undesirable. Of course, franchisees may find the purchase of Baskin-Robbins ice cream undesirable because it prevents them from selling a less expensive brand of ice cream under the Baskin-Robbins trademark. The antitrust laws, however, are not designed to facilitate such a fraud upon the consumer.

## C. *The Horizontal Market Allocation Claim*

Franchisees contend that the "dual distribution" system used by Baskin-Robbins constitutes an unlawful horizontal market allocation. This contention is premised on BRICO's dual role as both trademark licensor and area franchisor. According to franchisees, BRICO's practice of licensing exclusive territories to other area franchisors while retaining certain areas for itself constitutes a market allocation among competitors. Franchisees further argue that any "dual distribution" system is, in and of itself, a *per se* violation of the antitrust laws. We address the former contention first.

The hallmark of a horizontal market allocation is collusion among competitors to confer upon each a monopoly in a specific area. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

The District Court found that franchisees had failed to establish the concerted activity among competitors required to sustain a finding of a horizontal market allocation. In challenging this ruling, franchisees rely primarily on three cases: *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *United States v. Sealy*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); and *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).[16] These cases, according to franchisees, are indistinguishable from the present case and therefore require reversal. We conclude, how-

16. Franchisees cite many other cases in support of their position. Our review of these cases, however, convinces us they are inapposite. Many of the cited cases were decided under the now discredited authority of *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249, and are, therefore, unpersuasive. The remainder we find to be clearly distinguishable from the case at bar and, therefore, unworthy of discussion.

ever, as did the District Court, that these cases are clearly distinguishable from the case at bar. Indeed, our examination discloses that the only factor common to these cases is the existence of a trademark licensing agreement.

In *Timken*, a domestic manufacturer conspired with its foreign competitors to allocate, among themselves, the world market for anti-friction bearings. In both *Topco* and *Sealy*, competing manufacturers created wholly owned trademark licensors. The licensors then granted each competitor an exclusive area in which to manufacture and distribute the trademarked products. In both cases, the Supreme Court recognized that the trademark licenses were merely facades to mask an allocation of markets by pre-existing competitors.

The present case is markedly different. BRICO is neither owned nor controlled by the area franchisors. Unlike the situations in *Topco* and *Sealy*, the area franchisors have no voice over BRICO's decisions regarding grants of additional territories. Indeed, the District Court found that at all times the allocation of territory was dictated unilaterally by BRICO. "When a manufacturer acts on its own, *in pursuing its own market strategy*, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints." *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 168 (3rd Cir. 1979) (emphasis added) (cited with approval in *Ron Tonkin Gran Turismo v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1385 (9th Cir. 1981)). Accordingly, the District Court concluded that the territorial restrictions imposed by BRICO are vertical in nature and therefore not *per se* illegal.[17]

Franchisees attack this conclusion by pointing to several instances where, they allege, territories were transferred by one area franchisor directly to another. BRICO, however, introduced evidence indicating that the transfers were not between area franchisors but rather were instances where BRICO transferred territory from one area franchisor to another better able to service the area. The District Court, after weighing the evidence, concluded that these transfers were not the result of concerted activity by the area franchisors. It is not the function of this court to substitute its interpretation of the evidence for that of the District Court. *See, e. g., United States v. Mountain States Construction Co.*, 588 F.2d 259 (9th Cir. 1978). Because the findings on this issue are not clearly erroneous, we decline to overturn the District Court's determination that franchisees failed to establish their horizontal market allocation claim.

Franchisees also urge us to extend the rule of *per se* illegality to encompass dual distribution systems such as that practiced by Baskin-Robbins.

Neither the Supreme Court nor this court has yet squarely ruled whether dual distribution systems fall within the rule of *per se* illegality. Both times it has faced the issue, the Supreme Court has, *sub silentio*, treated dual distribution systems as imposing only vertical restraints. *See United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).[18] Because, however, the Court's silence is an unsteady foundation upon which to base a decision, we undertake our own inquiry into the ap-

---

17. Testimony of certain plaintiffs supports this finding. *See, e. g.*, Deposition of Anthony Feicco, Jr., Excerpt of Record at 323. ("It is like a General of the Army, he passes the orders down to the Division Manager ... and they (sic) carry it out.")

18. Franchisees seek to distinguish between two situations: 1) where a *manufacturer* grants exclusive territories to *distributors* while retaining distributional responsibilities in other territories; and 2) where a *manufacturer* licenses

other manufacturers to produce its product in exclusive territories while retaining manufacturing responsibilities in certain areas. Franchisees contend that *Schwinn* and *White Motor* dealt only with the former situation. While that may be true, we find this distinction unpersuasive in this case. Absent a showing of concerted activity to horizontally allocate markets among competitors, the status of the licensees as manufacturers or distributors is irrelevant.

propriate standard under which to measure the legality of dual distribution systems.

We take as our starting point the Supreme Court's admonition in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977): "[D]eparture from the rule-of-reason standard must be based upon demonstrable economic effect rather than—as in *Schwinn*—upon formalistic line drawing." Accordingly, our inquiry focuses not on whether the vertical or horizontal aspects of the system predominate, but rather, on the actual competitive impact of the dual distribution system employed by Baskin-Robbins.

■ The test for determining whether the rule of *per se* illegality should be extended to a business practice not heretofore afforded *per se* treatment is "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.' " *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1980) (citations omitted). Applying this test to the system at issue here, we conclude that application of the rule of *per se* illegality would be both inappropriate and anti-competitive.

It is evident that were BRICO to abandon its area franchisor responsibilities, the system here would be identical to that involved in *GTE Sylvania.* We do not believe that BRICO's decision to retain these responsibilities in certain areas has any significant effect on competition. Regardless of BRICO's decision, there would still be fourteen areas, each exclusively served by a single manufacturer-franchisor. Only the identity of the franchisor in a given area is affected by BRICO's decision to retain area franchisor responsibilities in certain territories.

To invalidate a distribution system on such basis is to revert to the kind of "formalistic line drawing" eschewed by the Court in *GTE Sylvania. See GTE Sylvania,* 433 U.S. at 58–59, 97 S.Ct. at 2562.

Franchisees have failed to establish here any significant, adverse impact upon either interbrand or intrabrand competition. Regarding intrabrand competition, the District Court found that franchisees failed to show that any area franchisor is capable of servicing the area of another on a sustained basis. Nor did franchisees establish the feasibility of a more extensive licensing program for the manufacture of Baskin-Robbins ice cream products.

Franchisees similarly failed to establish any adverse effect upon interbrand competition. Indeed, it appears that the distribution system at issue here may have actually fostered interbrand competition. Through the exclusive licensing of independent manufacturers, BRICO was able to expand into new geographic markets and promote the wider availability of its products.[19] This expansion allowed BRICO to grow from a small manufacturer serving only local markets into a vigorous competitor with outlets throughout the world.[20] *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 54–57, 97 S.Ct. 2549, 2559–2561, 53 L.Ed.2d 568; *GTE Sylvania, Inc. v. Continental T.V., Inc.,* 537 F.2d 980, 1000–04 (9th Cir. 1976) (*en banc*).

Moreover, modern economic thought indicates that the invalidation of a distribution system, absent a showing of anti-competitive effect, may actually retard competition. "Competition is promoted when manufacturers are given wide latitude in establishing their method of distribution and in choosing particular distributors. Judicial deference to the manufacturer's business

---

**19.** It is noteworthy that Baskin-Robbins' output increased steadily after the institution of its franchise system. According to Posner, this indicates the system actually increased competition. Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality,* 48 U.Chi.L.Rev. 6, 21 (1981).

**20.** Society derives other benefits from systems such as Baskin-Robbins'. They promote the availability of a wider variety of products on the competitive market. Further, franchise systems often enable a small businessman to obtain his own business with a minimum outlay of capital. Here, a Baskin-Robbins franchise may be obtained for as little as $40,000.

judgment is grounded in large part on the assumption that the manufacturer's interest in minimum distribution costs will benefit the consumer." *A. H. Cox & Co. v. Star Machinery Co.*, 653 F.2d 1302, 1306 (9th Cir. 1981) (citations omitted). *See also*, Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions*, 75 Colum.L.Rev. 282, 283–99 (1975); Posner, *The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision*, 45 U.Chi.L.Rev. 1 (1977).

■ Accordingly, we conclude that, in the absence of proof of anti-competitive purpose or effect, dual distribution systems must be evaluated under the traditional rule of reason standard.

### D. *The Wholesale Price Fixing Claim*

Franchisees final contention is that BRICO and its area franchisors conspired to fix the wholesale prices of Baskin-Robbins ice cream products. This contention is premised on two somewhat overlapping arguments. First, franchisees allege that BRICO and the area franchisors engaged in pricing discussions which resulted in the actual fixing of wholesale prices. Second, they allege that BRICO and its area franchisors engaged in continual exchanges of price information which facilitated the establishment of the maximum attainable wholesale prices. This latter practice, they contend, is a *per se* violation under *United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

The District Court ruled that franchisees had failed to sustain their burden of proof on this issue. On appeal franchisees do little more than re-argue the facts found against them at trial, contending that the findings below are clearly erroneous. We disagree.

■ At trial, franchisees presented evidence of roughly a dozen isolated communications regarding prices over a seven-year period. Several of these communications involved persons with no direct pricing responsibilities. Many were found by the District Court to be no more than idle "shop talk" such as often occurs between persons in the same field of endeavor. To counter the charge of actual price fixing, Baskin-Robbins introduced evidence, set forth in the margin, indicating that the prices charged by area franchisors were at all times widely disparate.[21] The District Court, after weighing the evidence, determined that the prices charged by the various area franchisors presented no pattern from which an unlawful price fixing conspiracy could be inferred. Because the record provides ample support for this ruling,[22] we decline to disturb the holding of the District Court on this issue.

■ The District Court also found that franchisees had established only sporadic exchanges of price information, not involving all the area franchisors, and having no effect upon actual pricing decisions. This finding is amply supported by the record. Because the mere exchange of price information, without more, is not *per se* illegal, *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975); *United States v. Container Corp. of America*, 393 U.S. 333, 338, 89 S.Ct. 510, 513, 21

---

21. The following table sets forth the difference in prices, from high to low, charged by the various area franchisors for Baskin-Robbins Ice Cream.

| Date | Range |
| --- | --- |
| January 1972 | 38 ¢ |
| January 1974 | 48 ¢ |
| January 1975 | 70 ¢ |
| January 1976 | 60 ¢ |
| January 1977 | 40 ¢ |
| January 1978 | 87 ¢ |

22. Franchisees assert that a price fixing conspiracy may be inferred from similarity in prices charged by area franchisors. We disagree. Mere similarity in prices, without more, provides too insubstantial a foundation to support an inference of an unlawful price fixing conspiracy. This is especially true where, as here, the area franchisors are manufacturing identical products pursuant to identical formulae. Similar costs would necessarily require somewhat similar prices.

**1358**

L.Ed.2d 526 (Fortas concurring), we conclude that franchisees failed to prove any unlawful conspiracy to fix the wholesale prices of Baskin-Robbins ice cream products.

### III.  CONCLUSION

We conclude that franchisees failed to establish *per se* violations of the Sherman Act on the part of Baskin-Robbins.  Because the parties stipulated that Baskin-Robbins should prevail absent proof of *per se* violation of the antitrust laws, the judgment below is

AFFIRMED.