708 F.2d 1423
 219 U.S.P.Q. 209, 1983-1 Trade Cases 65,467
 CALIFORNIA GLAZED PRODUCTS, INC., a California corporation,
Plaintiff-Appellant/Cross Appellee,
v.
The BURNS AND RUSSELL COMPANY OF BALTIMORE CITY, a Maryland
corporation, Defendant-Appellee/Cross Appellant.
 Nos. 82-4129, 82-4135.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 12, 1983.
Decided June 22, 1983.
 
 Richard Haas, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for plaintiff-appellant/cross-appellee.
 Lawrence Alioto, Alioto & Alioto, San Francisco, Cal., for defendant-appellee/cross-appellant.
 Appeal from the United States District Court for the Northern District of California.
 Before WISDOM*, Senior Circuit Judge, and SKOPIL and FERGUSON, Circuit Judges.
 WISDOM, Senior Circuit Judge:
 
 
 1
 This appeal presents the issue whether a trademark licensing agreement requiring California Glazed Products Co. ("CGP") to purchase from the Burns & Russell Company ("B & R") all the ingredients needed to make finished masonry blocks constitutes an unlawful tying arrangement in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. Sec. 1 (1976).[1] The jury found that an unlawful tying arrangement existed and awarded damages to CGP for losses stemming from the tying arrangement. Because we conclude that no tying arrangement exists in this case, we reverse.
 
 I.
 
 2
 B & R is a small Baltimore company which makes glazed masonry blocks. One of its employees, John Sergovic, a polymer chemist, with others, invented a patented process for baking a tinted, glazed face on a masonry block and developed the secret compounds used in that process. B & R owns three registered trademarks: (1) "Spectra-Glaze," which identifies the secret compound used in making glazed masonry blocks; (2) "Spectra-Glaze," which identifies the finished masonry block; and (3) "S-G Sand," which is the filler used in making the "Spectra-Glaze" facing. B & R also owns U.S. Letters Patent Nos. 3,328,231 and 4,031,289, which explain how to glaze a masonry block with a smooth, stain-resistant facing and how to make the finished product.
 
 
 3
 The main ingredients used to make the facing of a Spectra-Glaze block[2] are Spectra-Glaze Compound,[3] S-G Sand,[4] S-G Colors,[5] and fire retardant. These materials have been improved, tested, and refined over a period of years to develop a facing for masonry blocks that is resistant to staining, cracking, and discoloration. These blocks are available in 48 standard colors, come in a number of different scores, designs, and textures, and can be used to construct interior or exterior walls.
 
 
 4
 On March 7, 1958, CGP signed two agreements with B & R allowing it to manufacture and sell the Spectra-Glaze line of masonry blocks. The first, a patent license agreement, allowed CGP to use any patent owned by B & R for a two percent royalty. The term of the patent license agreement was for the life of the patents, and it did not require CGP to do or buy anything. The second agreement, the trademark license, authorized CGP to sell glazed blocks under the trademark Spectra-Glaze, but only if the blocks were glazed with Spectra-Glaze Compound. Under the trademark license, CGP agreed to purchase all its requirements needed to make the Spectra-Glaze facing from B & R. The term of the trademark agreement was 20 years, and after the first year, CGP could terminate it on 60 days' notice.[6]
 
 
 5
 Under these agreements, B & R furnished CGP formulas for combining the ingredients used in making Spectra-Glaze facing. B & R also furnished technical manuals and extensive technical assistance to CGP when problems arose or technical advice was needed.[7] B & R also provided marketing assistance and had an "Advisory Committee" to decide on how to advertise the Spectra-Glaze line. B & R provided CGP with sales and management support, including regular bulletins of market conditions and sales prospects, advertising material, sales aids, and sales training seminars. B & R commissioned independent laboratory tests to determine the quality of its product. With the exception of advertising, these services and others were provided to CGP at no charge.
 
 
 6
 From the outset, CGP's business was unsuccessful, in part because of the adverse effect of California building codes, business slumps, and strikes in the construction industry.[8] On March 7, 1978, CGP requested and was granted an extension of the trademark license. B & R attempted to help CGP by furnishing it new materials on consignment. Indeed, the defendant avers that the plaintiff remained in business only because the defendant was willing to act as its banker. On May 31, 1979, CGP notified B & R that it would terminate its contract because of technical and sales difficulties. CGP went out of business in June 1979.
 
 
 7
 During the 20-plus years of the parties' relationship, CGP had never advised B & R that it did not want to buy from B & R, or that CGP wanted to buy from someone else, or that CGP wanted any change in the relationship. Instead, on March 7, 1978, when the 20-year term of the trademark license expired, CGP requested that the license be extended for two additional years with an evergreen provision for additional two year periods.
 
 
 8
 CGP brought a suit against B & R alleging that the agreements between CGP and B & R constituted an illegal tying arrangement. CGP's contention at trial was that B & R unlawfully tied the sale of its Spectra-Glaze trademark for glazed, masonry blocks to the sale of the materials required to make Spectra-Glaze facing. CGP alleged that B & R overcharged CGP for these materials.[9] B & R counterclaimed for money due on patent royalties, a promissory note, and an open book account.
 
 
 9
 CGP and B & R agreed that CGP owed $12,866.36 on the promissory note and $18,750 on the patent royalties claim, and the jury was instructed to return a verdict in these amounts on these claims. The jury found that $4,444.28 was due on the open book account and awarded CGP $51,787.27 on its claim for overcharge damages. The court added interest of $4,745.93 to the amount of unpaid patent royalties. After trebling the damages and offsetting the amounts owed to B & R, the district court awarded $114,575.24 to CGP. The district court denied B & R's motion for judgment notwithstanding the verdict.
 
 
 10
 The defendant appeals on the ground that it is entitled to a judgment as a matter of law, and that there is no substantial evidence to support a reasonable jury's finding that there was an unlawful tying arrangement which caused damage to CGP. B & R contends also that if a tying arrangement existed, it was lawful and justifiable. Finally, B & R contends that there was insufficient evidence to support the award for damages. CGP argues that these issues involved factual determinations appropriate for jury resolution and that the jury properly found the existence of an illegal tie-in.
 
 
 11
 In deciding whether to reverse the district court's refusal to grant B & R's motion for judgment n.o.v., this court must determine whether the evidence when viewed most favorably to the party against whom the motion is directed cannot support a verdict in that party's favor. See Traver v. Meshriy, 627 F.2d 934, 939-40 (9th Cir.1980); Quichocho v. Kelvinator Corp., 546 F.2d 812, 813 (9th Cir.1976).
 
 II.
 
 12
 Tying arrangements traditionally have been treated as per se illegal under Section 2 of the Sherman Act and Section 3 of the Clayton Act, 15 U.S.C. Sec. 14 (1976). See Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 498-99, 89 S.Ct. 1252, 1258-1259, 22 L.Ed.2d 495, 502-03 (1969) (Fortner I).[10] A tying arrangement exists when a seller conditions a buyer's purchase of a desired product (tying product) on the buyer's agreement to purchase another product (tied product). Northern Pac. Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 550 (1958). To prevail on a tying claim, a plaintiff must show that the scheme involves two separate products and conditions the purchase of the tying product on the purchase of the tied product; that the seller possesses sufficient economic power in the tying market to restrain competition in the tied product market; and that a "not insubstantial" amount of commerce is affected by the tie-in. Fortner I, 394 U.S. at 499, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495, 502 (1969). Hirsh v. Martindale-Hubbell, Inc., 674 F.2d 1343, 1346-47 (9th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982); Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir.1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). This court has said that plaintiffs must show "some modicum of coercion" to establish a tie-in. Moore v. James H. Matthews & Co., 550 F.2d 1207, 1216 (9th Cir.1977).
 
 III.
 
 13
 In a tie-in case the first issue to be determined is whether two separate products exist that are tied together. The two products allegedly tied in this case are the Spectra-Glaze trademark and the ingredients used to make Spectra-Glaze blocks. CGP contends that the jury properly determined that the Spectra-Glaze trademark was the tying product B & R used to force CGP to buy Spectra-Glaze Compound and other ingredients from B & R.[11] B & R argues that, as a matter of law, the Spectra-Glaze trademark was not a separate tying product from the ingredients and the finished masonry block which the trademark identifies.
 
 
 14
 This Court recently has considered the issue whether a trademark can be a separate tying product from the products it represents.[12] In Krehl v. Baskin-Robbins Ice Cream Co., 664 F.2d 1348 (9th Cir.1982), decided after the judgment was rendered in the district court in the instant case, we found that the determination "whether a trademark may appropriately be regarded as a separate product requires an inquiry into the relationship between the trademark and the products allegedly tied to its sale." Id. at 1353. The Krehl Court distinguished between two kinds of franchising systems, the business format system and the distribution system, to determine if a trademark is a separate, tying product. The distinction is used to determine whether a producer's offerings are in response to independently structured consumer demand or are molded merely to force purchasers to buy component parts that they do not necessarily want. See Klamath-Lake Pharmaceutical Association v. Klamath Medical Service Bureau, 701 F.2d 1276, 1289 & fn. 14 (9th Cir.1983).
 
 
 15
 The Krehl Court explained that a business format franchise system is usually created merely to conduct business under a common trade name:
 
 
 16
 The franchise outlet itself is generally responsible for the production and preparation of the system's end product. The franchisor merely provides the trademark and, in some cases, supplies used in operating the franchised outlet and producing the system's products. Under such a system, there is generally only a remote connection between the trademark and the products the franchisee are compelled to purchase. This is true because consumers have no reason to associate with the trademark, those component goods used either in the operation of the franchised store or in the manufacture of the end product.
 
 
 17
 664 F.2d at 1353. In the business format system, consumers seek only the general services of franchisees, and franchisees can satisfy consumer demand by using "commonplace" items and applying the franchisor's general methods. In the business format context, the trademark is separate from the component goods because consumer demand can be satisfied with component goods not associated with the trademark.[13] See Klamath-Lake Pharm., 701 F.2d at 1289 n. 14; Krehl, 664 F.2d at 1353.
 
 
 18
 When a distribution system franchise is involved, however, the considerations change:
 
 
 19
 Under the distribution type system, the franchised outlets serve merely as conduits through which the trademarked goods of the franchisor flow to the ultimate consumer. These goods are generally manufactured by the franchisor or, as in the present case, by its licensees according to detailed specifications. In this context, the trademark serves a different function. Instead of identifying a business format, the trademark in a distribution franchise system serves merely as a representation of the end product marketed by the system.... Because the prohibition of tying arrangements is designed to strike solely at the use of a dominant desired product to compel the purchase of a second undesired commodity..., the tie-in doctrine can have no application where the trademark serves only to identify the alleged tied product.
 
 
 20
 Krehl, 664 F.2d at 1354 (footnotes and citations omitted). In a distributor franchise, consumers are drawn to the franchise because its trademark indicates the availability of the franchisor's quality component products, and consumers could not effectuate their market choices if a franchisor was unable to force the franchisee to buy component products from the franchisor.[14] See Klamath-Lake Pharm., 701 F.2d at 1290 n. 14.
 
 
 21
 B & R contends that its arrangement with CGP is clearly a distribution franchise system and that its trademark indicates the presence of B & R's quality components in the end product of the franchising system. We agree. The evidence at trial showed that the "Spectra-Glaze" brand block trademark always identified a product made with Spectra-Glaze Compound and B & R's other ingredients, that these ingredients originated from B & R, and that consumers purchased these goods with the understanding that they were made with the B & R quality components. "Spectra-Glaze" brochures emphasized that Spectra-Glaze blocks were made of Spectra-Glaze components, and numerous major purchasers of Spectra-Glaze would not buy the product unless B & R certified that Spectra-Glaze brand ingredients were used in its formulation. Builders using Spectra-Glaze blocks depend on purchasing blocks that met the specifications and qualities for which B & R had tested Spectra-Glaze, and they were drawn to the franchisee's product because the Spectra-Glaze trademark indicates the availability of B & R's quality component products.
 
 
 22
 Other considerations support B & R's contention that its franchising arrangements are of the distribution type. B & R did not force CGP to buy component goods that were not essential to maintaining the quality of its end product. For example, franchisees could purchase concrete blocks from any available source. The only goods that CGP had to buy from B & R involved B & R's trade secrets and "were of a special design uniquely suited to the franchised business." Krehl, 664 F.2d at 1352. In addition, B & R never has sold the trademark separate from the final product and component products upon which it appears. These facts show that the function of the Spectra-Glaze trademark is to identify the presence of a glazed masonry block made up of the specially-formulated, thoroughly tested, high quality component parts rather than to indicate a product manufactured in conformity to a franchisor's quality standards.
 
 
 23
 We conclude that the desirability of the trademark and the quality of B & R's components represented by the trademark are inextricably interrelated in the consumer's mind in a manner that precludes finding that the trademark is a separate item for tie-in purposes. B & R's franchising system is designed to distribute to consumers the high quality, glazed masonry block that users of this product have come to expect. The structure of B & R's franchising system does not indicate any attempt to exact tribute from CGP in an anti-competitive manner. The Spectra-Glaze trademark serves to show the source of the goods purchased, and the goodwill of the trademark attaches to the products made for or by B & R. Thus, we conclude that the nexus between the Spectra-Glaze trademark and the allegedly tied products is so close that they must be considered one product. See Hamro v. Shell Oil Co., 674 F.2d 784, 788 (9th Cir.1982).
 
 
 24
 We hold that the district court erred in not granting B & R's motion for judgment notwithstanding the verdict. Viewing the entire evidence in the light most favorable to CGP, we conclude that no tying arrangement exists because there was no showing that the Spectra-Glaze trademark and the various ingredients used to make Spectra-Glaze were separate products capable of being tied. We reverse the judgment in favor of CGP and remand the case to the district court to enter judgment in favor of B & R on the tying claim.[15]
 
 
 
 *
 Honorable John Minor Wisdom, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 Section 1 of the Sherman Act provides in pertinent part, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. Sec. 1 (1976). For decisions holding tying arrangements illegal under Sec. 1 of the Sherman Act, see United States v. Loew's, Inc., 371 U.S. 38, 52, 83 S.Ct. 97, 105-106, 9 L.Ed.2d 11, 22 (1962); Northern Pacific Ry. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 518-19, 2 L.Ed.2d 545, 550-51 (1958)
 
 
 [2]
 The Spectra-Glaze block is a concrete block onto which a glazed finish has been baked. This process is explained in the Joint Pretrial Statement:
 
 
 [11]
 The type of coated, glazed masonry unit referred to in the defendant's patents is manufactured by applying a slurry to a concrete block and passing the block through an oven, which causes the coating to solidify. In formulating the slurry and determining the manufacturing process, the object is to obtain an end product in which there is bonded to the block an attractive, smooth surface, tinted to a desired color, which is easy to clean, withstands various staining agents, chemicals and temperature changes, and meets various other specifications including limits on smoke generation and flame spread. The manufacturing process involved is inflexible and unforgiving, and the ingredients employed in the slurry are critical if a proper end product is to be achieved
 
 
 [3]
 Spectra-Glaze Compound is made for B & R by U.S.S. Chemicals. U.S.S. Chemicals prepares a polyester resin and combines it with secret ingredients supplied by B & R to make the compound. B & R has provided U.S.S. Chemicals with the procedures and formulations needed to make Spectra-Glaze Compound. This product is valuable, and the process to make it is a trade secret
 
 
 [4]
 S-G Sand is a specially treated sand used to prevent Spectra-Glaze block from staining. It is a white, spherical sand found only in certain mines in Illinois. B & R developed a special reagent to make the sand, and this reagent is B & R's trade secret. The Faskure Division of Aurora Metal Company produces S-G Sand for B & R pursuant to a written secrecy agreement
 
 
 [5]
 Mixing these colors to achieve uniformity is extremely difficult because the color of each ingredient affects the color of the finished facing. Pigment Dispersion, Inc. ("PDI") makes these colors for B & R, but B & R is an active participant in the process and ensures that all coloring meets its standards. B & R owns the color formulas, and PDI will not sell these colors to anyone else
 
 
 [6]
 The parties also signed an advertising agreement. This agreement required B & R's licensees to contribute to the joint advertising of Spectra-Glaze blocks in Sweet's Catalogue, which is a multi-volume directory of building materials used by architects. This agreement is not at issue in this litigation
 
 
 [7]
 For example, between Jan. 1, 1976, and June 1979, B & R's troubleshooter, Bruce Goodwin, flew from Baltimore to CGP's San Jose plant eight times and spent 51 days assisting CGP with technical problems. The total number of trips by B & R's employees to San Jose over the years was 111. These trips were all at B & R's expense. B & R conducted national marketing meetings for the licensees, set up booths at industry trade shows to advertise Spectra-Glaze, and had Spectra-Glaze facings tested by independent laboratories. B & R prepared special colors when architects requested them, and even refurbished the molds at CGP's plant
 
 
 [8]
 Within two years of plaintiff's formation in 1958, Rogers had exhausted all the capital raised to start the business. Tr. 248. As appears from plaintiff's income tax returns (Exs. CF-1--22), portions of which are summarized in Ex. EE, plaintiff's first 15 years of operation produced only three profitable years, and the total profit for those three years was only $9,356. From at least 1969 forward, plaintiff was insolvent. Tr. 459. Plaintiff's balance sheet of February 28, 1976, shows cash of $3,019, obligations of $366,969 and retained earnings of minus $374,595. From 1967 forward, plaintiff was indebted to defendant on a promissory note and on a book account. During the last four years, defendant furnished plaintiff with raw materials on consignment so that plaintiff would incur no liability to pay until the materials were actually used
 
 
 [9]
 CGP contended that it would have operated profitably if it had not paid inflated prices for the materials used in making the Spectra-Glaze facing. The jury awarded damages to compensate CGP for these overcharges. CGP also sought damages for losses caused by its going out of business, but the district court ruled that these damages were too speculative for jury consideration. CGP cross-appealed and argued that this ruling was in error, but CGP has withdrawn this cross-appeal
 
 
 [10]
 The rationale for proscribing tie-ins is that they deny competitors free access to the tied product market, "not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market." Fortner I, 394 U.S. at 498-99, 89 S.Ct. at 1256, 22 L.Ed.2d at 502. Tie-ins also harm buyers by forcing them to forego their free choice between competing products. Id. at 499, 89 S.Ct. at 1256-1257, 22 L.Ed.2d at 502. Many commentators, however, have criticized the application of the per se illegal label to tie-ins, especially in the franchising context. See Baker, The Supreme Court and the Per Se Tying Rule: Cutting the Gordian Knot, 66 Va.L.Rev. 1235 (1980); Note, A New Approach to the Legality of Franchising Tie-Ins, 129 U.Pa.L.Rev. 1267 (1981); cf. R. Posner, Antitrust 612-18 (1974) (economic theory suggests that the traditional rationale against tie-ins is incorrect). But see L. Sullivan, Antitrust Sec. 156 (1977)
 
 
 [11]
 CGP argues that the tying product in this case was not just the trademark, but the trademark and the patent. The district court disagreed and instructed the jury that the only possible tying product was the trademark. The district court properly determined that the patent was not the tying product. The patent agreement was separate from the trademark agreement, and in fact, B & R had a licensee that operated under the patent without the trademark. The patent agreement required CGP to buy nothing; the trademark agreement required CGP to buy ingredients from the defendant. The trademark agreement could also be terminated on 60 days notice without affecting CGP's rights under the patent agreement. These facts support the district court's determination that the trademark, and not the patent, was the only possible tying product in this case
 
 
 [12]
 For a discussion of how other courts have treated the separability issue, see Zeidman, The Two Product Test in Franchising: If You Want to Get X, You Gotta Buy Y, 1980 Ariz.St.L.J. 433; Comment, The Single Product Issue in Recent Tying Litigation, 1980 Ariz.St.L.J. 871; Note, Antitrust Franchising--Principe v. McDonald's Corp.--Big Mac Attacks the Chicken Delight Rule, 7 J.Corp.L. 137 (1981); Note, Product Separability in Franchise Tying Arrangements: The Fourth Circuit's New Rule, 38 Wash. & Lee L.Rev. 1195 (1981)
 
 
 [13]
 The franchise arrangement in Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir.1971), is an example of the business format system. In exchange for the use of its trademark, Chicken Delight required its franchisees to purchase a specified number of cookers and fryers and to purchase certain packaging supplies and mixes exclusively from Chicken Delight at above market prices. The Court examined this franchising system and determined that its purpose was not to distribute the trademarked goods of the franchisor, but to conduct a certain business under a common trademark or trade name. In these circumstances, the trademark simply reflects the goodwill and quality standards of the enterprise which it identifies. The quality standards and business system of Chicken Delight, rather than the source of the component products, resulted in the goodwill that attached to the Chicken Delight trademark. The Chicken Delight Court properly concluded that the remote connection between the trademark and the commonplace articles the franchisees were required to purchase warranted treating the trademark as a separate tying product. For discussions of Chicken Delight, see Baker, The Supreme Court and the Per Se Tying Rule: Cutting the Gordian Knot, 66 Va.L.Rev. 1235, 1253-56; Note, The Single Product Issue in Recent Tying Litigation, 1980 Ariz.St.L.J. 871, 888-908; Note, Antitrust-Franchising--Principe v. McDonald's Corp.--Big Mac Attacks The Chicken Delight Rule, 7 J.Corp.L. 137 (1981); Note, A New Approach to the Legality of Franchising Tie-Ins, 129 U.Pa.L.Rev. 1267, 1294, 1303-04 (1981)
 
 
 [14]
 Krehl involved the franchising of Baskin-Robbins ice cream. Franchisees argued that Baskin-Robbins's policy of conditioning the grant of a franchise on the purchase of ice cream exclusively from Baskin-Robbins constituted an unlawful tying agreement between the Baskin-Robbins trademark and the ice cream. The Court found that Baskin-Robbins franchisees serve merely as conduits through which the trademarked goods flow to the consumer and classified the franchise system as a distribution-type system. In this context, the trademark represents the end product made up of quality Baskin-Robbins's ingredients rather than a particular business format, and the Court held that trademark and the product were intertwined in a way that precluded them from being treated as separate products. See Hirsh v. Martindale-Hubbell, Inc., 674 F.2d 1343 (9th Cir.1982); Hamro v. Shell Oil Co., 674 F.2d 784 (9th Cir.1982)
 
 
 [15]
 We deny CGP's request for attorney's fees for this appeal. Each party is ordered to bear its own costs