Terry SMITH, et al., Plaintiffs,

v.

MOBIL OIL CORPORATION, Defendant.

Civ. A. Nos. 74–585–CV–W–0; 75–398–CV–W–0; 75–399–CV–W–0 and 75–682–CV–W–0.

United States District Court, W.D. Missouri, W.D.

July 24, 1987.

**1316**

George M. Bock, Slagle & Bernard, Kansas City, Mo., for plaintiffs.

R. Lawrence Ward, John M. Kilroy, Jr., Shughart, Thomson & Kilroy, Kansas City, Mo., Andrew J. Kilcarr, Donovan, Leisure, Newton & Irvine, Brian Harvey, Office of Mobil General Counsel, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

STEVENS, District Judge.

Plaintiffs, in their own behalf and as representatives of a class of former gasoline service station operators who leased their premises from Mobil Oil Corporation ("Mobil"), allege that Mobil has engaged in tying arrangements in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Before the court is Mobil's motion for summary judgment on all of the plaintiffs' claims, and the plaintiffs' cross-motion for partial summary judgment on the issue of whether the "Mobil franchise package," (the alleged "tying" item) is something separate from the alleged "tied items," (gasoline, motor oil and tires, batteries, accessories and specialties, the latter four items being referred to collectively as "TBAS").

For the reasons stated below, the court grants summary judgment in Mobil's favor with respect to all the plaintiffs' claims. The plaintiffs' cross-motion for partial summary judgment, of course, is denied.

I.

*Statement of the Case*

A tying arrangement is characterized by a seller's refusal to sell one product except on the condition that the buyer also purchase a second product. The first product is called the "tying" product; the second the "tied" product. *See Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). According to traditional analysis, in order to establish a tying arrangement which violates Section 1 of the Sherman Act, plaintiffs must prove: (1) that the alleged tying and tied items are separate products; (2) that the seller has sufficient economic power with respect to the tying item to coerce purchase of the tied product; and (3) that the amount of affected interstate commerce in the tied product market is not insubstantial.[1] *See Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n.*, 666 F.2d 1130 (8th Cir.1981) *cert. denied*, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982); *Northern v. McGraw Edison Co.*, 542 F.2d 1336, 1344–45 (8th Cir.1976) *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977). As the Supreme Court recently explained:

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

Central to the plaintiffs' tying claim is their definition of the "Mobil franchise package"—the alleged tying product:

---

**1.** The elements of a tying claim under Section 1 of the Sherman Act are the same as those of a tying claim under Section 3 of the Clayton Act, with the exception that under the latter the tying and tied items must both constitute "goods, wares, merchandise, machinery, supplies or other commodities." *See* 3 Von Kalinowski, *Antitrust and Trade Regulation* § 12.04[1] (1986).

"Mobil franchise package" means the right to use and display the name "Mobil" and other "Mobil trademarks," as defined, in connection with the operation of a retail service station business, including the right to use signs and service station equipment or fixtures displaying the name "Mobil" and other "Mobil trademarks" as defined, and the right to occupy and operate a service station premises displaying the name "Mobil" together with the right to receive from Mobil Oil Corporation materials (including the Mobil credit card system and imprinter, instruction manuals, handbooks, management records and other goods and commodities), suggestions and advice relating to the operation of a service station.

Plaintiffs claim that Mobil used economic power which it allegedly had with respect to the "Mobil franchise package," to compel plaintiffs, as a condition to obtaining that "package," to purchase from Mobil all the gasoline, oil and TBAS offered for sale from the plaintiffs' service stations. Plaintiffs argue that Mobil's act in thus "forcing" them to buy gasoline, motor oil and TBAS exclusively from Mobil significantly foreclosed competition in the wholesale markets for those items, and that plaintiffs were compelled to purchase the tied products at prices in excess of fair market value.

Concerning the plaintiffs' gasoline tying claim, Mobil argues that the plaintiffs' tying product is not the putative "Mobil franchise package," but simply Mobil's trademark. Proceeding from that premise, Mobil argues that its trademark is not a product separate from its gasoline, and thus that the two are incapable of being tied.[2]

Concerning the plaintiffs' TBAS and motor oil tying claims, Mobil asserts that an essential element of those claims is that Mobil "coerced" plaintiffs to purchase only Mobil products. Mobil argues that plaintiffs compromised their ability to prove coercion during class certification proceed-

ings, when counsel for the plaintiffs agreed to prove the oil and TBAS claims using *only* the terms of uniform contracts and leases between the parties (and Mobil's uniform policies as reflected in the uniform agreements), which, by Mobil's account, contain nothing that forced any class member to buy TBAS or oil as a condition to obtaining a Mobil franchise. Mobil also argues that the plaintiffs' oil tying claim is not a tying claim at all, but rather a challenge to the legality of Mobil's vertical distribution system for oil.

The plaintiffs' cross-motion for summary judgment asks that the court recognize the separate nature of the "Mobil franchise package" and the alleged tied items. Plaintiffs also argue, however, that insofar as the court determines that plaintiffs are actually depending on Mobil's trademark as a tying item, the court should find that the Mobil trademark is separate from the gasoline Mobil sold plaintiffs.

## II.

### *The Summary Judgment Standard*

Under Rule 56(c), Fed.R.Civ.P., summary judgment is appropriate if the moving party shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The moving party bears the burden of proof. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the movant properly supports a motion for summary judgment, however, an adverse party may not rest on the mere allegations of his pleading, but must set forth by affidavit or otherwise specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, ––––––––, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 273–74 (1986).

Traditionally, summary judgment on the merits in antitrust actions has not been favored. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). How-

---

**2.** Mobil also argues with respect to the gasoline claim that plaintiffs have no "legal injury" as required by Section 4 of the Clayton Act, and that the plaintiffs' claims are barred under the state action doctrine. Given the disposition of Mobil's "single product" argument below, the court does not address these alternative arguments.

ever, the Supreme Court has approved the use of summary judgment in antitrust cases more recently on several occasions. See *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986); *Northwest Wholesale Stationers, Inc. v. Pacific Stationery*, 472 U.S. 284, 297–98, 105 S.Ct. 2613, 2621, 86 L.Ed.2d 202 (1985); *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 339, 102 S.Ct. 2466, 2470, 73 L.Ed.2d 48 (1982), and as the Eighth Circuit has long recognized: "where there has been ample opportunity for discovery, summary judgment is appropriate in antitrust litigation, just as in any other litigation, upon a showing by the movant of an absence of any genuine issue of material fact." *Willmar Poultry Co. v. Morton-Norwich Products, Inc.*, 520 F.2d 289, 293 (8th Cir.1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976) (citations omitted); *see also Rice v. Mobil Oil Corp.*, 1980–2 Trade Cases (CCH) ¶ 63,355 at 75,805 (W.D.Mo.1980).

This action has been pending since 1975. On September 24, 1982, after seven years of discovery directed at the so-called "class certification issue," though by the nature of the beast including some "merit discovery," Judge John R. Gibson certified the matter as a class action. Shortly thereafter, on December 2, 1982, Mobil filed its motion for summary judgment. The interim between Mobil's filing the motion and the present date has seen much additional discovery and briefing directed toward the issues raised by Mobil's summary judgment motion. The discovery plaintiffs have undertaken since Mobil filed its motion has given them a fair opportunity to discover facts to oppose Mobil's motion. In short, Mobil's motion for summary judgment is now ripe for resolution.

### III.

#### *Undisputed, Uncontroverted and Stipulated Facts*

Given the posture of the case it seems appropriate at the outset to set forth those facts on which this disposition is based.

As previously mentioned, in the hearing on the class certification issue held before Judge Gibson, counsel for the plaintiffs stipulated that in pursuing their tying claims as a class, plaintiffs would rely solely on the content of the standard contracts and leases entered into between the parties, and uniform policies as reflected in those agreements. Judge Gibson explicitly relied on that stipulation in finding that questions of law or fact common to the members of plaintiffs' class predominate over questions affecting only individual members. Before the court are copies of agreements entered into between Mobil and the plaintiffs' class representatives.

Those materials reveal that Mobil dealers obtained what plaintiffs have defined as the "Mobil franchise package" by entering into the following series of (essentially uniform) agreements with Mobil: First, all class members entered into "Service Station Lease" agreements with Mobil.[3] The rent figures in the lease agreements were based on the quantity, "of motor fuel delivered into the storage tanks at the premises...." Among the various obligations of the lessees, the following provision is pertinent:

Tenant agrees ... (b) not to make alterations or additions in the premises or to place any additional structures on the premises without [Mobil's] prior written approval, except that tenant may, without such approval, install storage and merchandising equipment for petroleum products, tires, batteries, and automotive accessories if removable without damage to the premises ... (d) to keep legible and visible all brand names, trademarks and signs [of Mobil] on [Mobil's] pumps, containers, and equipment now or hereafter placed on the premises and to use such pumps, containers, and equipment solely for [Mobil's] products....

All plaintiffs also entered into "Retail Dealer Contracts" with Mobil. Each of

---

**3.** Plaintiffs have stipulated that they do not allege that Mobil used economic power that it has in the service station site market to force pur-

chases of any tied items. The service station leases are not, therefore, tying items in this case.

those contracts specified (in varying amounts) minimum and maximum purchase requirements of both Mobil-supplied oil and gasoline. No minimum purchase requirement of TBAS was contained in any dealer agreement, although maximums were specified. The "Retail Dealer Contracts" also contained the following language:

> *Trademarks, Advertising.* Buyer shall use seller's trademark and brand names to identify and advertise seller's products. Buyer shall not mix any other products with seller's products or adulterate them in any other way. Buyer shall not use seller's trademark or brand names in connection with the storing, handling, dispensing or sale of products other than seller's products. . . .

In addition, a majority, if not all the plaintiffs, were parties to an "Equipment Loan Agreement" with a "Sign and Rent Equipment Rider." In connection with these latter agreements, Mobil dealers leased equipment ranging from gasoline storage tanks to desks, chairs and fire extinguishers. The dealers agreed, with respect to all such equipment, to "use it solely for company's products." With respect to the sign rentals, dealers agreed to use the signs "solely for lessor's products on the premises. . . ."

The remainder of the relationship between Mobil and the plaintiffs included by plaintiffs as part of the "Mobil franchise package" does not appear in the agreements before the court[4]; nevertheless, the court for present purposes takes Mobil's practice of supplying its dealers with various miscellaneous business management and advertising materials, including a credit card system, dealer training programs and the like, as undisputed fact.

Mobil also admits that it commonly participated in gasoline "exchanges" with other oil companies. A good deal of the gasoline Mobil supplied its dealers was not produced, refined, or delivered by Mobil, although it is undisputed that Mobil does produce and refine gasoline. Rather, because of the economics of gasoline distribution, Mobil contracted with other companies to deliver gasoline from the other companies' "exchange terminals." This gasoline was delivered from those terminals by common carrier (invoiced by Mobil) to be stored by Mobil dealers in Mobil-leased tanks, and pumped by Mobil dealers from Mobil-leased gasoline pumps. All of the gasoline ultimately sold by dealers from Mobil pumps, however, was supplied directly or indirectly (through the practice of "exchange") by Mobil.

It is also undisputed that Mobil dealers did nothing more with respect to gasoline sales than pump Mobil-supplied gasoline from storage tanks into customers' cars, and in self-service stations, of course, did not do even that. Mobil dealers supplied no additive to the gasoline and did not change the gasoline physically or chemically. In short, the plaintiffs were mere conduits in the distribution chain of Mobil-supplied gasoline to the ultimate consumer.

Furthermore, certain facts established by the affidavit of Mr. Andrew L. Gaboriault, a vice-president of Mobil with extensive experience in Mobil's marketing and licensing practices, remain uncontroverted. Mr. Gaboriault states:

> On the basis of such experience, involvement and familiarity with these and other aspects of Mobil's business throughout the United States, I can and do unequivocally attest that Mobil has never sold nor licensed its Mobil brand gasoline trademark to any dealer or other gasoline marketer as a product separate and apart from the Mobil-branded gasoline which is sold under that mark; Mobil has never authorized the use of its Mobil brand gasoline trademark by any dealer or other gasoline marketer apart from the sale of Mobil-branded gasoline; and Mobil has never sought nor received any

---

**4.** The "Retail Dealer Contracts" mention Mobil's "retail credit program," to which plaintiffs presumably refer as the "Mobil credit card system," in defining the "Mobil franchise package." However, the contracts refer to the credit program only as an option in which dealers could have participated: "If the Buyer participates in the Seller's retail credit program. . . ." Whether a given dealer participated in the credit program (or, indeed, was required to do so) does not appear from the agreements before the court.

licensing fee or royalty from any dealer or other gasoline marketer for the use of its Mobil-brand gasoline trademark separate and apart from the sale of Mobil-branded gasoline.

In an attempt to controvert Mr. Gaboriault's testimony, plaintiffs argue that even though Mobil did not explicitly license its trademark separately, the rental fees Mobil charged its dealers were in substance separate licensing fees for the use of Mobil's trademark. That characterization strains a bit, but even if it were so, it still does not show that Mobil licensed its trademark separately from Mobil's sale of gasoline or other petroleum products.[5] It accordingly remains uncontroverted that Mobil never sold its trademark as an item separate from gasoline or other petroleum products to which the Mobil label was attached.[6]

Finding that the above undisputed, uncontroverted and stipulated facts are such as to permit a ruling as a matter of law with respect to this action, the court turns to the merits of the pending motion.

## IV.

### The Gasoline Tying Claim

With respect to the gasoline tying claim, the plaintiffs' prayer for relief asks the court to enjoin Mobil from requiring its dealers to purchase any gasoline from Mobil as a condition to obtaining the "Mobil franchise package"—and, of course, for damages arising from Mobil's alleged illegal tying arrangement. The court's inspection of the terms of the uniform agreements on which plaintiffs have stipulated they will rely in proving the existence of a tying arrangement discloses two aspects of those agreements that conceivably could be characterized as "tying" Mobil gasoline purchases to components of the "Mobil franchise package."

First, both the "Service Station Leases" and the "Retail Dealer Contracts" contained clauses (quoted above) that restricted the plaintiffs from dispensing products not purchased from Mobil from equipment bearing the Mobil trademark, or otherwise using the Mobil trademark in connection with non-Mobil supplied products. As display of the Mobil trademark is a component of the "Mobil franchise package," as defined, the above clauses obviously had the effect of conditioning receipt of that "package" on purchases of Mobil-supplied gasoline. Second, the minimum gasoline purchase requirements contained in the "Retail Dealer Contracts" arguably could be characterized as "tying" gasoline purchases to a dealer's receipt of those other miscellaneous, non-trademark components of the "Mobil franchise package," as defined by the plaintiffs.[7] As previously mentioned, Mobil argues that the plaintiffs' ty-

---

**5.** The best plaintiffs have been able to achieve in this vein is to discover certain memoranda, written by low-level personnel in Mobil's legal department, suggesting such a separate licensing arrangement in Connecticut. There is no evidence in the record, however, that Mobil ever instituted such a practice.

**6.** The court has been liberal in allowing plaintiffs a broad spectrum of discovery on this issue. After years of pursuing their inquiry, however, plaintiffs cannot point to a single instance where the Mobil trademark was licensed or sold apart from its connection to a Mobil-branded product. Plaintiffs have found many instances where the converse is true, that is, where Mobil sold gasoline that was not marketed under the trademark "Mobil." These sales of plain gasoline have no effect on the issue of the separability of the Mobil trademark from Mobil-branded gasoline, however, but simply establish the hardly astonishing fact that there is a demand for unbranded gasoline. This state of affairs does not establish that there was a separate market for the Mobil trademark, apart from the gasoline to which the mark was attached. It is the plaintiffs' burden to show that the "character of the demand" for the Mobil trademark is such that Mobil's alleged tie linked "two distinctive markets." *See Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 19, 104 S.Ct. 1551, 1562, 80 L.Ed.2d 2 (1984). Plaintiffs' failure to show that the Mobil trademark was ever licensed apart from a Mobil-branded product leaves the *Hyde* burden unsatisfied. *See Jack Walters & Sons Corp. v. Morton Bldg., Inc.,* 737 F.2d 698 (7th Cir.), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984).

**7.** Plaintiffs also apparently rely on the restrictions in the "Equipment Loan Agreements" with "Sign and Rent Riders," which required dealers to use equipment and signs rented from Mobil solely for Mobil's products, as constituting tying provisions. The court disagrees. Those provisions did not require dealers to purchase any products from Mobil, or restrict dealers from

ing product is not really the putative "Mobil franchise package," but in substance, is really the Mobil trademark. In making this argument Mobil regards the essential aspect of plaintiffs' prayer for relief as the plaintiffs' desire to sell non-Mobil gas from pumps displaying the Mobil trademark. It seems to the court, however, that plaintiffs are free to allege and argue whatever they wish with regard to the identity of the tying product; Mobil's characterization of the "actual substance" of plaintiffs' tying product as the Mobil trademark also ignores the plaintiffs' assertion (which, it seems to the court, must be addressed) that Mobil's practice of making them purchase *any gasoline at all* from Mobil to be resold in their gasoline service stations as a condition to Mobil's supplying the plaintiffs with those other miscellaneous aspects of the "Mobil franchise package," such as management materials and the like, constituted an illegal tying practice—a practice effected by Mobil's minimum gasoline purchase requirements.

Nevertheless, the court agrees with Mobil that if the Mobil trademark is not something separate from whatever it identifies, then, to the extent that plaintiffs rely on the trademark as a tying product, their claims fail. Accordingly, the initial question to be addressed is whether Mobil-branded gasoline and the Mobil trademark are, in the eyes of the law, two separate products, or only one. The court then addresses whether those remaining aspects of the "Mobil franchise package," apart from the Mobil trademark, may be considered as separate items to which purchases of Mobil-supplied gasoline were tied. In connection with the former inquiry, the court turns to what has become known in this litigation as the *Hamro-Krehl* line of cases.

## A.

### The Trademark Tying Issue Under the Hamro-Krehl Line of Analysis

In *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348 (9th Cir.1982), fran-

chisees of Baskin-Robbins argued that Baskin-Robbins' policy of conditioning the grant of a franchise upon the purchase of ice cream exclusively from Baskin-Robbins was an illegal tying arrangement. *Id.* at 1350. The Baskin-Robbins plaintiffs relied on *Siegal v. Chicken Delight,* 448 F.2d 43 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), arguing that *Chicken Delight* established that a trademark is invariably a separate item from the product to which it is attached when that product is distributed through a franchise system. *See Krehl,* 664 F.2d at 1352. The Ninth Circuit rejected the franchisee's claim, holding that the Baskin-Robbins trademark could not be treated as an item separate from the ice cream it represented. *Id.* at 1354.

In analyzing the plaintiffs' claims in *Krehl,* the court began by examining the relationship between the trademark and the products allegedly tied to its sale, noting that this relationship varies depending on the type of franchising system at issue. The court distinguished between two franchise systems: (1) a "business format" system; and (2) a "distribution" system:

A business format franchise system is usually created merely to conduct business under a common tradename. The franchise outlet itself is generally responsible for the production and preparation of the system's end product. The franchisor merely provides the trademark and, in some cases, supplies used in operating the franchised outlet and producing the system's product.

. . . .

Where a distribution system, such as that employed by Baskin-Robbins, is involved, significantly different considerations are presented (citation omitted). Under the distribution type system, the franchised outlets serve merely as conduits through which the trademarked goods of the franchisor flow to the ulti-

purchasing and reselling non-Mobil supplied products, so long as non-Mobil supplied equip-

ment and signs were used to sell such products.

mate consumer. These goods are generally manufactured by the franchisor or, as in the present case, by its licensees according to detailed specifications. (footnote omitted). In this context, the trademark serves a different function. Instead of identifying a business format, the trademark in a distribution franchise system serves merely as a representation of the end product marketed by the system.

*Id.* at 1353. The *Krehl* court noted that the franchise system in *Chicken Delight* was a business format system. The tying item was the Chicken Delight trademark, which served to identify Chicken Delight's distinctive business format. The tied items were commonplace paper products and packaging goods, neither manufactured by the franchisor nor uniquely suited to the franchised business. *Id.* at 1352–53. Under business format systems such as the one in *Chicken Delight,* the *Krehl* court explained, the connection between the trademark and the product the franchisees are compelled to purchase is remote enough that the trademark, which "simply reflects the goodwill and quality standards of the enterprise it identifies," may be considered as a separate product from the commonplace items that are tied to the trademark's use. *Id.*

In a distribution franchise system, on the other hand, according to the *Krehl* court, a trademark is not so much attached to a business format as to the product whose quality the mark represents. "The desirability of the trademark is therefore utterly dependent upon the perceived quality of the product it represents." *Id.* Accordingly, when a trademarked product is sold in a distribution-type franchise system, the trademark and the product are not separate products for purposes of an antitrust tying claim.[8]

The distinction, drawn in *Krehl,* between a "business format" franchise and a "distribution" franchise was applied in the context of gasoline sales in *Hamro v. Shell Oil Co.,* 674 F.2d 784 (9th Cir.1982). The *Hamro* plaintiff was a Shell dealer who claimed that Shell illegally tied the use of its trademarks to sales of Shell products. *Id.* at 787. Shell did not dispute the fact that its dealer agreement expressly granted the plaintiff the right to use Shell's trademark on the condition that he sell only Shell products under the trademark. *Id.* The plaintiff in *Shell,* however, was a "mere conduit" in Shell's gasoline distribution system. Under these circumstances, the *Hamro* court held that the Shell trademark, "when used in connection with the sale of gasoline, merely identified the source of the gasoline and did not constitute a separate and distinct product." *Id.* at 788.

Mobil cites many other cases that have adopted the *Hamro-Krehl* distinction between "business format" and "distribution" franchises in deciding whether a trademark is a separate product for antitrust tying purposes from the item to which it is attached. *See, e.g., Power Test Petroleum Distrib. v. Calcu Gas,* 754 F.2d

---

**8.** Three different types of franchising are noted in a law review article cited by the *Krehl* court, McCarthy, *Trademark Franchising and Antitrust: The Trouble with Tie-ins,* 58 Cal.L.Rev. 1085, 1089 (1970). Of course, other methods and nomenclatures for classifying franchise arrangements exist. *See, e.g.,* Strasser, *Big Macs and Radio Shacks: Antitrust Policy for Business Format Franchises,* 27 Ariz.L.Rev. 341–2 (1985); Note, *Trademark Franchising and Antitrust Law—The Two-Product Rule for Tying Arrangements,* 27 Syracuse L.Rev. 953, 955–57 (1976). It is universally acknowledged that the term "franchising" covers a wide range of business relationships, and it seems equally clear that no hard and fast line always may be drawn between one recognized "type" of franchising arrangement and another. *See Casey v. Diet Cen-*

ter, Inc., 590 F.Supp. 1561, 1566 (N.D.Cal.1984). Some skepticism, therefore, may justly be directed at a judicial test that involves a determination whether a given franchising system is of one type or another.

On reflection, however, it appears that the line can be accurately and justly drawn by the court in most of the cases likely to arise. No one would argue, for example, that McDonald's is in the hamburger manufacturing or distributing business, or that Dolby Laboratories is actually engaging in "business format" franchising when it sells sound equipment to theatres. In systems that arguably are hybrids, guidance may be obtained by narrowing the inquiry. "The crucial inquiry is into the relationship between the trademark and the product allegedly tied to its sale." *Krehl,* 664 F.2d at 1353 n. 11.

91, 96–98 (2d Cir.1985); *T.A.M., Inc. v. Gulf Oil Corp.*, 553 F.Supp. 499, 506–07 (E.D.Pa.1982); *Redd v. Shell Oil Co.*, 524 F.2d 1054, 1056–57 (10th Cir.1975), *cert. denied*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976); *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 704–05 (7th Cir.1984); *California Glazed Products v. Burns and Russell Co.*, 708 F.2d 1423, 1428–29 (9th Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); *Eprad, Inc. v. Dolby Laboratories, Inc.*, 209 U.S.P.Q. 238, 242–43 (N.D.Ohio 1980); *Refrigeration Engineering Corp. v. Frick Co.*, 370 F.Supp. 702, 711 (W.D.Tex. 1974); *Mid-America ICEE, Inc. v. John E. Mitchell Co.*, 1973–2 Trade Cases (CCH) ¶ 74,681 at 94,987 (D.Or.1973). Backed by this case authority, Mobil's argument is that plaintiffs simply distributed gasoline under the Mobil trademark—a trademark which was not, and could not, be a product separate from the gasoline it identified.

Within this context, and putting aside for the moment their broader view of the "Mobil franchise package," plaintiffs argue that the Mobil trademark is a separate product from gasoline for tying purposes because Mobil dealers were "business format" franchisees rather than "distribution" type franchisees. In this connection, the plaintiffs rely on Mobil's practice of supplying its dealers with credit card imprinters, handbooks, manuals and other business management materials, as well as the "pervasive use and display" of the name "Mobil" in and around the plaintiffs' service station operations. The court rejects the plaintiffs' position, however.

Initially, the plaintiffs' reliance on the "pervasive display" of the Mobil trademark is misplaced. As Mobil points out, display of a product's trademark in either type of franchise is to be expected. When such a display is so "pervasive" as to convert a distribution type franchise into a business format franchise would be difficult to determine. Second, dealer support activity in the way of supplying business management materials of the sort relied on by the plaintiffs may be expected to exist in either type franchise. In *Krehl*, for example, although not considered as part of the claims

at issue, the court noted that the Baskin-Robbins franchisees had originally included in their tying claims such items as "equipment, supplies and advertising" supplied by Baskin-Robbins as items tied to the Baskin-Robbins trademark. *See* 664 F.2d at 1352 n. 9. Those franchises, of course, were found to be of the distribution type. 664 F.2d at 1354. Finally, and perhaps most importantly:

> [A] franchise system may be of the "distribution" type in relation to the end product of the system and of the "format" type in relation to the kinds of incidental supplies tied to the sale of the trademark in *Chicken Delight*. The crucial inquiry is into the relationship between the trademark and the product allegedly tied to its sale.

*Id.* at page 1353 n. 11. The plaintiffs' Mobil service stations may have been hybrid in nature, having perhaps some aspects of "business format" franchises. The question presently under consideration, however, concerns only the word "Mobil" with the distinguishing logo that accompanies it in regard to plaintiffs' gasoline sales, not to the various other aspects of the business of running a service station.

On the other hand, an inquiry into the relationship between Mobil and the plaintiffs reveals similarities to the "distribution" type franchises, as found in the *Hamro-Krehl* line of cases. In this connection, Mobil points out three particular factors for consideration. First, as noted above, it is Mobil's business to refine and sell petroleum products and Mobil was, directly or indirectly, the source of all the gasoline sold to plaintiffs. This situation is typical of a "distribution-type" franchise. *See Krehl*, 664 F.2d at 1353; *Hamro*, 674 F.2d at 788; *Power Test*, 754 F.2d at 98; *Jack Walters & Sons*, 737 F.2d at 704. To state the matter conversely, Mobil did more in this case than merely provide its trademark to its dealers. *See Krehl*, 664 F.2d at 1353. Plaintiffs, of course, dispute any characterization of Mobil as the "origin" of the gasoline ultimately marketed under the Mobil trademark, pointing to Mobil's prac-

tice of selling "exchange" gasoline. Whether Mobil refined the gasoline itself or had it refined and delivered for sale under its name, however, does not affect Mobil's position as the ultimate source of all the Mobil trademarked gasoline sold plaintiffs. *See Krehl,* 664 F.2d at 1353, n. 14; *Redd,* 524 F.2d at 1057; *Power Test,* 754 F.2d at 97–98. Second, Mobil dealers were mere "conduits" through which Mobil sold gasoline. The plaintiffs were in no way "responsible for the production and preparation of the system's end product." The plaintiffs' "conduit" status is symptomatic of a "distribution" type franchise. *See Krehl,* 664 F.2d at 1353; *Hamro,* 674 F.2d at 788. Third, again as discussed above, it is uncontroverted that Mobil never marketed its trademark separately from gasoline or other petroleum products labeled by the Mobil trademark. This fact also reinforces the characterization of plaintiffs' franchises as "distribution" in nature. *See Redd,* 524 F.2d at 1057; *Power Test,* 754 F.2d at 97; *Jack Walters & Sons, Corp.,* 737 F.2d at 704; *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.,* 509 F.Supp. 357, 377 (N.D.Cal.1981), *aff'd,* 698 F.2d 1011 (9th Cir.1983).

On review of the *Hamro-Krehl* line of cases, the court is persuaded that the three factors considered above are sufficient as a matter of law to characterize the plaintiffs' franchises as the "distribution" type, with respect to the plaintiffs' gasoline sales.[9] Accordingly, the Mobil trademark is not, under the law, separate from the gasoline it identifies, but the two are one and the same thing, namely, Mobil-branded gasoline. To the extent that the plaintiffs rely on the Mobil trademark as a component of the "Mobil franchise package," and rely on the above-quoted trademark restriction clauses in the various agreements between the plaintiffs and Mobil, then, Mobil is entitled to summary judgment on the plaintiffs' tying claims. In reaching this decision this court is in accord with the analysis set forth in *Krehl* and its progeny, and, in particular, with those cases where courts have found that the trademark of the supplying company is not separable from the gasoline sold under the trademark. *See, e.g., Hamro v. Shell Oil Co.,* 674 F.2d 784 (9th Cir.1982); *Power Test Petroleum Distributors v. Calcu Gas,* 754 F.2d 91 (2d Cir.1985); *T.A.M., Inc. v. Gulf Oil Corp.,* 553 F.Supp. 499 (E.D.Pa.1982); *Redd v. Shell Oil Co.,* 524 F.2d 1054 (10th Cir. 1975).

### B.

### *The Plaintiffs' Objections to the Hamro-Krehl Line of Cases*

Plaintiffs have raised various arguments against the soundness of the *Hamro-Krehl* line of cases which merit consideration. First, plaintiffs argue that at least a dispute of fact exists whether the Mobil name displayed at Mobil's service stations represents a "business format" rather than the "source" of the petroleum products sold there. In support of this argument, plaintiffs point to information obtained from Mobil to the effect that consumers regard gasoline as fungible, and are not led to one gasoline station or another by the brand of gasoline sold there. Based on this data plaintiffs argue that it remains an open question whether consumers go to Mobil stations because of their preference for the standard business practices of Mobil stations, as represented by display of the Mo-

---

9. The court is unable to find any Eighth Circuit case that mentions the above distinction between distribution franchises and business format franchises in the trademark franchising context. Existing precedent in this circuit, however, does not appear to be inconsistent with the distinction. Of the cases brought to the court's attention, *Rosebrough Monument Co. v. Memorial Park Cemetery,* 666 F.2d 1130 (8th Cir.1981), and *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.,* 772 F.2d 467 (8th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1460, 89 L.Ed.2d 718 (1986), do not involve tying claims in the trade-

mark franchising context. *Northern v. McGraw-Edison Co.,* 542 F.2d 1336 (8th Cir. 1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977) involves a trademark franchise tying claim. My review of *Northern* leads me to agree with Mobil's view that the franchise there was of a business format nature, and that *Northern* is, therefore, not inconsistent with the disposition of the instant motion. The rationale in *Kugler v. AAMCO Automatic Transmission, Inc.,* 460 F.2d 1214 (8th Cir.1972) appears to support the present ruling.

bil trademark, or to obtain Mobil branded and supplied products.

■ The court need not pass on the existence of a factual dispute concerning why people bring their custom to Mobil service stations, however. The court has concluded that as a matter of the substantive law of antitrust—specifically, the law concerning franchise-trademark tying arrangements—consumer perceptions are immaterial to deciding the nature of a particular franchise system.[10] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, ——, 106 S.Ct. 2505, 91 L.Ed.2d 202, 211 (1986) (substantive law identifies which facts are material; disputes of facts not affecting outcome of action under that governing law do not preclude summary judgment).

■ The perceptions of consumers, of course, sometimes play an important role in trademark law, as, for example, in determining whether a descriptive mark has become protected through acquisition of a secondary meaning. *See Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.,* 780 F.2d 1324, 1330 (8th Cir. 1985); *Bell v. Streetwise Records, Ltd.,* 640 F.Supp. 575, 581 n. 15 (D.Mass.1986). Of course, Mobil's mark is not of the descriptive type, but consumer perceptions or expectations are also "crucial in establishing just what the mark has come to identify, i.e., what the 'goods' are." *Streetwise Records,* 640 F.Supp. at 581, *citing* 1 J. McCarthy, *Trademarks and Unfair Competition,* § 16:14 at 755–57 (2d ed. 1984). For this reason, the protectible interest represented by a trademark may be expanded by public awareness that use of the mark has been extended to a related family of goods. *See Lucien Piccard Watch Corp. v. Crescent Corp.,* 314 F.Supp. 329, 334 (S.D.N.Y.1970).

Consumer perceptions concerning the nature of what is represented by or associated with the posting of a large Mobil sign

over a gasoline station, therefore, could be important in determining—for purposes of trademark law—the scope of the property interest involved in the Mobil trademark. The present action, however, does not involve a dispute over the validity or extent of Mobil's interest in its trademark. It is not open to serious question that the Mobil trademark, at least in its connection with Mobil-supplied gasoline, is entitled to protection. *See, e.g., Itin Oil Co. v. Mobil Oil Corp.,* 527 F.Supp. 898, 901 (E.D.Mich. 1981); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 478 F.Supp. 243, 279–80 (E.D. Pa.1979) *aff'd,* 637 F.2d 105, 123 (3d Cir. 1980), *cert. denied* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *Blue Bell Co. v. Frontier Refining Co.,* 213 F.2d 354, 360–61 (10th Cir.1954). Rather, the question before the court concerns the role that Mobil's trademark plays in an antitrust context. In that setting, a consumer's perceptions or expectations (whether those of the franchisee service station operator, or those of the end consumer) would appear largely irrelevant. Holding otherwise would be to hinge the entire result of a tying claim, whenever an alleged tying item was (in whole or in part) a trademark, upon whatever the outcome of a public opinion poll might be. This court would be loathe so to destabilize an area of law already in need of greater stability and predictability. And in fact it seems to the court a somewhat strange concept that the legality of an arrangement between two parties ought to be controlled by the mere untutored perceptions of third party bystanders. In sum, in the antitrust area, the proper test to be applied is the three part test mentioned earlier. Whether that test leads to a finding of a "distribution type" franchise, or simply means that one who meets those criteria ought to be able to compel a franchisee to sell only the franchisor's product under the franchisor's

---

10. The *Krehl* court did speak of consumer perceptions in explaining why a trademark may be a separate item for tying purposes in a "business format" franchise, but not in a "distribution" type franchise. *See Krehl,* 664 F.2d at 1353. The *Hamro* court spoke similarly in reaching its decision. *See Hamro,* 674 F.2d at 788. Con-

sumer perceptions play no part, however, in distinguishing one type franchise from the other; rather, the three-part test applied above is used, which distinguishes what are essentially product distribution systems from systems where merely a method of doing business is sold.

trademark, the result is the same—there is no illegal tie.

In a related attack, plaintiffs argue that the *Hamro-Krehl* cases are wrongly decided because they are based on a now-outmoded distinction borrowed from trademark protection law. Specifically, plaintiffs argue, the basic idea that a trademark can or ever does represent the source or origin of a product, is no longer viable. *See Chicken Delight*, 448 F.2d at 48. Instead, plaintiffs contend, trademarks have grown to become a representation, not of the actual source of goods, but that goods meet certain standards of quality. *Id.; see generally* Note, *Quality Control in the Antitrust Laws and Trademark Licensing*, 72 Yale L.J. 1171, 1176–77 (1963). Plaintiffs note that trademark law has changed in modern times to conform to this changed expectation, and that now a trademark may be maintained provided that a franchisor maintains adequate specifications for the manufacture or purchase elsewhere of the goods that are ultimately sold under the mark. *See* 15 U.S.C. § 1127; *see also Oberlin v. Marlin American Corp.*, 596 F.2d 1322, 1327 (7th Cir.1979); *Kentucky Fried Chicken v. Diversified Packaging*, 549 F.2d 368, 387 (5th Cir.1977).

The logical consequence of all this, plaintiffs argue, is that a seller ought to be allowed to "restrict the trade" in the market in which it sells its trademarked product by requiring that items sold under the trademark holder's mark be purchased from the holder only when no less onerous means exist for quality-control of the product.

The court remains unconvinced. First, plaintiffs are incorrect in stating that the distinction drawn in the *Hamro-Krehl* cases between business format and distribution franchises is based on a requirement that a trademarked product actually be manufactured or produced by the trademark holder. It is true that the court in *Hamro*, for example, concluded that the Shell trademark "merely identifies the source" of the gasoline. Such statements do not embody the rationale underlying the distinction between business format and distribution type franchises, however, but are simply statements of the conclusion that the type of franchise at hand is of the distribution type, rather than of the business format type. The distinction is based, however, not on concepts of "source" borrowed from trademark law, but on the distinctions between the two methods of franchising explained above.[11]

■ Second, although the court agrees with plaintiffs that the Lanham Act permits the holder of a trademark not to produce the product marketed under the trademark, but merely to promulgate specifications that the product must meet in order to be sold under the trademark, this fact alone does not necessarily lead to the conclusion that the Lanham Act *requires* a holder of a trademark to allow anyone who distributes the trademarked item, but can obtain or produce a passable substitute, to market that item under the trademark. Indeed, as noted above, courts have repeatedly enforced the rights of oil companies to insist that only their gasoline be sold under their trademark. If the Lanham Act is to be rewritten to require compulsory trademark licensing, it is not a task for this court. *See Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 704–05 (7th Cir.1984). In sum, plaintiffs' argument that the *Hamro-Krehl* line of cases are unsound as relying on outmoded trademark law is rejected.

Finally, plaintiffs argue that *Jefferson Parish Hospital v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), decided during the pendency of this motion, overruled, rejected, or is inconsistent with the *Hamro-Krehl* line of cases.

In *Hyde*, the petitioners argued that the general care and services provided by a hospital were not a "separate product"

---

11. The court in *Power Test Petroleum Distributors v. Calcu Gas,* 754 F.2d 91 (2d Cir.1985) does seem to rely heavily on concepts from trademark law in its approach to the single product issue. Ultimately, however, *Power Test* follows the lead of *Krehl* and *Redd.* In any case, to the extent that *Power Test* relies on an outmoded "source" theory of trademark law this court does not follow its rationale.

from the services of a group of anesthesiologists who practiced using the hospital's operating rooms. *Hyde*, 466 U.S. at 19, 104 S.Ct. at 1561–62. Petitioners claimed that the hospital was "merely providing a functionally integrated package of services." *Id.* In rejecting this contention, the Supreme Court stated:

> Our cases indicate ... that the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items.

*Id.* Plaintiffs characterize Mobil's argument that its trademark is not a separate product from the gasoline sold under the mark as relying on the "functional relationship" approach rejected in *Hyde*. Plaintiffs' characterization of Mobil's argument is inaccurate, however, and plaintiffs' view that *Hyde* explicitly or implicitly overruled the *Hamro-Krehl* approach to the "separate products" issue in the trademark franchising context is, in this court's view, mistaken.

Mobil has not in its briefs relied on the "functional relationship" between its trademark and the gasoline sold under the mark. Rather, Mobil has consistently put forth the argument, to which the court has agreed ultimately, that with respect to its gasoline sales, Mobil service stations were "distribution" type franchises, and in such franchises a trademark is not a separate item from the product sold under it, but serves merely to identify the source of the product. It may be true that the Mobil mark, in fact, has a "close functional relationship" to Mobil gasoline. But that does not preclude a finding that only one product is present, so long as an approach consistent with *Hyde* is followed.

The court finds it difficult to accept the conclusion that *Hyde* overruled the whole flock of *Hamro-Krehl* cases without mentioning even one of them. The allegations in *Hyde* did not involve franchising or an alleged trademark tie. Nevertheless, the plaintiffs cite *Casey v. Diet Center, Inc.*, 590 F.Supp. 1561, 1565 (N.D.Cal.1984), where a district court opined that *Hyde* "at least implicitly" rejected the approach taken by the *Hamro-Krehl* cases. The *Casey* court based this aspect of its opinion on several factors. First, the court states that the *Hamro-Krehl* test generates legal results "based on the application of conclusory labels." *Id.* This does not, however, seem a fair assessment of the analysis, at least as originally set out in *Krehl*, which requires not simply labeling, but an examination of several fundamental aspects of a franchising system to reach a conclusion on the single product-trademark issue.

Another of the *Casey* court's criticisms of the *Hamro-Krehl* cases is that:

> [T]he *Krehl* test directs attention to the market in which the ultimate consumer purchases, but *Hyde* requires that "any inquiry ... must focus on the ... markets in which the two products are sold...." In the franchise context, the markets in which the products are sold are those in which the *franchisees* purchase. Thus, whether the franchise arrangement ties separate products is not necessarily related to the perception of ultimate consumers who purchase in a different market downstream from that of the franchisor.

*Id.* at 1565–66; *but see Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 671–74 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986), (focusing on choices available to downstream consumers in deciding market power issue in context of computation service franchises). The difficulty with plaintiffs' reliance on the above-quoted passage is that it mischaracterizes the *Hamro-Krehl* analysis. As discussed above, distribution franchises are not distinguished from business format franchises on the basis of consumer perceptions in a "downstream market." The three factors considered above in deciding that plaintiffs' service stations were "distribution" type franchises all concern the "upstream" relationship between Mobil and its service station operators. First, Mobil is in the business of selling Mobil-branded gasoline and supplied, directly or indirectly, all the gasoline sold to the plaintiffs. Second, Mobil dealers did nothing to the gasoline supplied them by

Mobil, but acted only as conduits for Mobil-branded gasoline. Third, Mobil has never sold its trademark (at any level in its distribution chain) separate from its petroleum products.

Consideration of the above three factors, in fact, accords with the *Hyde* single product inquiry. The factors are of use in distinguishing between a distribution franchise and a business format franchise precisely because in the former system there is no demand for the trademark "separate in character" from the product sold, while that might not be the case in the latter system. At the same time it becomes clear that the plaintiffs' franchises were of the distribution type, it also becomes apparent that the provisions that plaintiffs complain about in their dealer arrangements, linking display of Mobil's trademark to Mobil-supplied gasoline, did not "link two distinct markets such that the harm which the prohibition against tying is aimed at is liable to occur." *See Hyde*, 466 U.S. at 19, 104 S.Ct. at 1562; *see also Jack Walters & Sons*, 737 F.2d at 704; *T.A.M., Inc.*, 553 F.Supp. at 507.

The *Casey* court's final criticism of the *Hamro-Krehl* approach is that all franchise arrangements cannot necessarily be fitted neatly into one category or another. Although this is no doubt true (see footnote 8, *infra*), this court is unwilling to disregard a substantial body of case authority unmentioned in *Hyde* due to only occasional difficulties in its application. In sum, the court accepts the validity of the *Hamro-Krehl* approach in deciding whether, for tying purposes, a trademark is separate from the item to which it is attached.

### C.

### *Non-Trademark Aspects of the "Mobil Franchise Package"*

■ Having concluded that the Mobil trademark is not a separate product for tying purposes from Mobil-branded gasoline, the plaintiffs must rely on those other, non-trademark aspects of the "Mobil franchise package," as defined above, as tying items. As previously mentioned, no explicit provision of the uniform agreements between the parties, as such, bound Mobil dealers to purchase Mobil-branded gasoline as a condition to obtaining credit card materials, advertising and other business management materials and advice. The only restrictions in the agreements which arguably had that effect were the minimum gasoline purchase provisions. The court is of the opinion, however, that as a matter of law the minimum gasoline purchase provisions cannot be characterized as tying together, as separate products, Mobil-branded gasoline and the non-trademark components of the "Mobil franchise package."

Nothing in the agreements before the court restricted the plaintiffs from purchasing or leasing storage tanks or pumps from a source other than Mobil and selling gasoline other than Mobil-branded gasoline from them, while retaining their status as Mobil dealers. The language quoted above from the standard real estate leases provided just that possibility.[12] The agreements between the parties, therefore, were not "exclusive dealing" arrangements of the sort which, at least in the area of franchising, seem susceptible to being characterized as tying arrangements. *See Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.*, 463 F.2d 1002, 1012–16 (5th Cir.), *cert. denied*, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972); *compare Mobil Oil Corporation v. Shah*, No. 86–C–3010 (N.D. Ill. Mar. 12, 1987) [Available on WEST-LAW, DCT database] (LEXIS), Gen.Fed. Library Dist. File (no franchise tie where dealer required to buy from Mobil 27.5% of the amount of gasoline dealer purchased from former franchisor, and dealer free to sell other suppliers' gasoline from non-Mobil supplied, separately marked pumps). Procurement of the "Mobil franchise package" did not force the plaintiffs to sell only Mobil gasoline.

Nor have the plaintiffs shown satisfactorily that the minimum gasoline purchase provisions in the plaintiffs' "Retail Dealer

---

**12.** In fact, there is evidence in the record that some Mobil dealers (though apparently none of the plaintiffs in this action), did sell non-Mobil supplied gasohol from plain pumps.

Contracts" linked a "distinct gasoline market" to a "distinct market" in the sort of non-contractual, business management materials Mobil supplied its dealers—and on which plaintiffs depend as non-trademark components of the "Mobil franchise package." *See Hyde,* 466 U.S. at 19, 104 S.Ct. at 1562. As a petroleum company marketing its products through retail outlets, Mobil supplied its dealers with an integrated method of merchandising Mobil gasoline. That effort included supplying Mobil dealers with advertising, business management materials, a credit card system, dealer training programs and the like. Mobil was not in the business of selling a generic method for operating gasoline stations to which it tied gasoline purchases from Mobil as an incidental item. The non-trademark aspects of the "Mobil franchise package" that plaintiffs received were part and parcel of a joint effort on the part of Mobil and the plaintiffs to succeed in a single market—that of retail gasoline. *See Kugler v. Aamco Automatic Transmissions, Inc.,* 460 F.2d 1214, 1215–16 (8th Cir.1972); *Principe v. McDonald's Corp.,* 631 F.2d 303, 309 (4th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981). From the dealers' perspective, it was the uncompounded right to operate a Mobil franchise selling Mobil gasoline that plaintiffs received when they became Mobil franchisees. *See TAM, Inc. v. Gulf Oil Corp.,* 553 F.Supp. at 507; *see also Casey,* 590 F.Supp. at 1566 (no tie where franchisees bargain for the right to sell products which do not represent a market distinct from that of the franchise itself); *Will,* 776 F.2d 665, 670 n. 1 (no tie where a method of doing business not sold separately from the ingredients that go into method of business). Under these circumstances, the minimum gasoline purchase require-

ments in Mobil's "Retail Dealer Contracts" with the plaintiffs did not constitute illegal ties. Having concluded that no illegal ties existed in connection with the trademark components of the "Mobil franchise package," of course, this additional conclusion entitles Mobil to summary judgment with respect to the entirety of the plaintiffs' gasoline tying claims.

V.

*Plaintiffs' TBAS Tying Claim*

■ As mentioned above, with respect to the plaintiffs' TBAS tying claims, Mobil ignores any dispute regarding the content of the "Mobil franchise package," and argues simply that nothing in its agreements with the plaintiffs "forced" the plaintiffs to purchase any TBAS from Mobil. Given the plaintiffs' stipulation that they will present no proof of "coercion" on an individual basis, Mobil argues that the plaintiffs cannot prove that Mobil did anything to tie purchases of TBAS to the plaintiffs' purchases (or leases) of any "tied" item. Without such proof, Mobil argues that plaintiffs cannot establish a *prima facie* tying case. *See, e.g., Hyde,* 466 U.S. at 18, 104 S.Ct. at 1561; *Rosebrough Monument Co.,* 666 F.2d at 1140; *Ass'n for Intercollegiate Ath. for Women v. NCAA,* 735 F.2d 577, 589 (D.C.Cir.1984). The plaintiffs, on the other hand, argue that no proof of coercion relating to individuals is required,[13] asserting rather that the agreements they each entered into with Mobil, when read together, establish that Mobil "conditioned" grants of its dealerships on purchases of TBAS.

Turning again to the agreements between the parties, the court observes initially that the minimum purchase require-

---

**13.** The plaintiffs' stipulation that they will not offer evidence of coercion individually would summarily cause them to suffer a failure of proof under the law of at least one circuit. *See Amey v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486 (11th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986) (requiring "evidence of actual coercion by the seller that in fact forced the buyer to [purchase] the tied item," as part of a plaintiff's *prima facie* showing). In other courts, an explicit contractual

tying term may suffice, without any showing of coercion on an individual basis. *See Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 452 (3rd Cir. 1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *see generally* Von Kalinowski 2 *Antitrust Laws and Trade Regulation* § 6G.02[1]. In any case, as explained in the text above, given plaintiffs' stipulation regarding individual proof, the plaintiffs' TBAS claim would be defective under either rule.

ment section of the standard "Retail Dealer Contract" contained no tying provision. In each of those contracts before the court, the minimum purchase requirement of TBAS was specified as "none." The court understands this provision to mean what it says, namely, that Mobil dealers were free to buy no TBAS from Mobil.

The plaintiffs maintain, however, that it may be true that no minimum purchases of TBAS were required, but other provisions in the contracts between the parties required them to purchase TBAS *from Mobil,* if they purchased any TBAS to sell at their stations. Plaintiffs claim that under *Hyde,* the presence of provisions in their agreements with Mobil that artificially forced the purchasers to make a less than optimal choice of the source from which to purchase the tied item suffices to show illegal "forcing." Unfortunately, regardless of whether the argument plaintiffs make is legally correct or incorrect, no "other provisions" in the agreements between the parties limited the plaintiffs' source for purchase of TBAS to Mobil.[14]

The "Service Station Lease" agreements, for example, explicitly contemplated alternate sources of supply for TBAS, providing (as previously quoted) that, "tenant may, without [Mobil's] approval, install storage and merchandising equipment for petroleum products, tires, batteries, and automotive accessories if removable without damage to the premises...." Other previously quoted provisions in the agreements between the parties required plaintiffs to keep Mobil's name "legible and visible" on Mobil products, and to use Mobil's name to "identify and advertise" Mobil's products, while prohibiting the use of the Mobil name "in connection with ... products other than [Mobil's]." The court is unable to conclude, however, that those provisions forced plaintiffs to purchase TBAS only from Mobil. Rather, those provisions only

prohibited plaintiff from advertising non-Mobil supplied TBAS as Mobil products.

The same thing may be said of restrictions contained in the plaintiffs' agreements to rent Mobil signs. Plaintiffs were required only to refrain from using the name Mobil to advertise non-Mobil TBAS. Nothing in the "Equipment Loan Agreement" or "Sign and Rent Equipment Rider" prohibited advertising and selling of non-Mobil TBAS under the names or trademarks of those products. Similarly, the plaintiffs' promises to use other miscellaneous equipment leased from Mobil "solely for [Mobil's] products" did not restrict the plaintiffs' purchasing options for TBAS.

Given the court's assessment of the terms of the contracts entered into between the parties, the conclusion with respect to the plaintiffs' TBAS tying claims is clear. Plaintiffs stipulated that they would offer no evidence of coercion by Mobil directed at individual dealers. The uniform agreements contain no "forcing" by Mobil of its dealers to buy TBAS solely from Mobil. Summary judgment is, therefore, appropriate in favor of Mobil with respect to the plaintiffs' TBAS tying claims. *See Hyde, supra.*

### VI.

### *The Plaintiffs' Oil Tying Claims*

█ In connection with the plaintiffs' oil tying claims, Mobil again focuses on the "coercion" element of the plaintiffs' claims. Unlike the situation with respect to purchases of TBAS, however, the plaintiffs' "Retail Dealer Contracts" contained minimum purchase requirements of Mobil oil. Nevertheless, Mobil asks the court to rule that those minimum purchase requirements for oil are insufficient to prove plaintiffs' tying claims, asserting that some members of the plaintiff class *desired* to purchase their minimum quotas of oil from Mobil,[15]

---

**14.** Plaintiffs' reliance on *Blanton v. Mobil Oil Corp.,* 721 F.2d 1207 (W.D.Wash.1983) is misplaced. The court in *Blanton* did not rely solely on the terms of Mobil dealer agreements to establish coercion, but on substantial evidence offered on an individual basis of coercion exerted by Mobil marketing representatives on Mobil

dealers regarding purchases of TBAS. *Id.* at 1210–11.

**15.** During the course of this litigation, the plaintiffs stipulated that some class members desired to purchase Mobil-branded oil from Mobil in quantities equal to or exceeding their minimum

so that the question whether the plaintiffs were, indeed, "forced" to purchase oil from Mobil can only be answered on an individual basis.

The court declines to follow Mobil's argument. Nevertheless, summary judgment in favor of Mobil with respect to the plaintiffs' oil tying claims is appropriate. As a company refining and manufacturing petroleum products, Mobil was no less in the business of distributing its oil through retail franchises than its gasoline. Plaintiffs do not assert that their minimum purchase requirements for oil were actually exclusive dealing provisions. Just as the trademark and minimum purchase provisions of the agreements between the parties relating to gasoline gave rise to no viable tying claims, therefore, neither do the corresponding provisions relating to oil. The court finds no other provisions in the agreements between the parties uniquely relating to the plaintiffs' oil purchases which give rise to any tying claims. Accordingly, following the same rationale as that stated above with respect to the plaintiffs' gasoline tying claims, the court also grants Mobil summary judgment with respect to the plaintiffs' oil tying claims.

### VII.

### ORDERS

Given that the disposition of this motion relies heavily on the plaintiffs' stipulation regarding individual proof, it seems appropriate to consider whether judgment in Mobil's favor against the plaintiffs as a class should be entered, or rather, whether an order decertifying the plaintiffs' class should be entered, which would allow claims to proceed on an individual basis. The class notices sent out in this action provided, in part, as follows:

> As a member of the plaintiff class, you would also be bound by any judgment favorable to the defendant and adverse to the class. In establishing the prerequisites to certification as a class under Rule 23(b)(2), plaintiffs have stated that they will rely solely on the content of

standard contracts and leases and the uniform policies of defendant as reflected in the uniform agreements, in order to prove the existence of the tying arrangement. Plaintiffs have stated that they will not offer individual testimony from class members to establish individual pressure or coercion.

Having reviewed the language quoted above, the court concludes that decertification is an inappropriate measure; accordingly, it is

ORDERED defendant's motion for summary judgment with respect to all the plaintiffs' tying claims is granted; it is further

ORDERED plaintiffs' cross motion for summary judgment on the issue of whether the "Mobil franchise package" is a separate item from the alleged tied items in this action is denied; it is further

ORDERED class counsel shall, within 30 days of the date of this order, prepare, file, and serve a suggested form of notice to all class members advising of the court's disposition of this matter; it is further

ORDERED defendant shall have 15 days from the date of the filing of the suggested form of notice called for by the preceding paragraph within which to comment on the same; it is further

ORDERED that each party shall bear its own taxable costs herein incurred and expended.

### ADDENDUM

While this writer willingly issues and accepts responsibility for this opinion, in the main it represents, in point of fact, the final example of the excellent legal scholarship of the late Honorable Ross T. Roberts. The opinion was in the final stages of preparation at the time of Judge Roberts' death on April 24, 1987.

---

purchase requirements. The court subsequently allowed the plaintiffs to withdraw that stipulation. As the court does not accept Mobil's argument relating to the plaintiffs' desire to pur-

chase their minimum quantities of oil, any disputes of fact on the issue of individual class member wishes in that regard do not preclude summary judgment.